MICHAEL RATSCH, PETITIONER-APPELLANT, v. CARL HOLDERMAN, COMMISSIONER OF LABOR AND TRUSTEE OF THE ONE PER CENT FUND, DEFENDANT-RESPONDENT.

Submitted November 30, 1959—Decided February 8, 1960.

*Mr. Stephen V. R. Strong* argued the cause for the petitioner-appellant (*Messrs. Strong & Strong,* attorneys; *Mr. Carl A. Frahn* on the brief).

*Mr. David M. Satz, Jr.,* Deputy Attorney General, argued the cause for the defendant-respondent (*Mr. Grover C. Richman, Jr.,* Attorney General of New Jersey, attorney; *Miss Grace J. Ford,* Assistant Deputy Attorney General, on the brief).

The opinion was delivered

PER CURIAM. Petitioner sought to recover compensation from the "One Per Cent Fund" (*R. S.* 34:15–94 *et seq.*) upon the thesis that a compensable injury suffered in his last employment, superimposed upon prior disability, resulted in total incapacity. The Deputy Director found petitioner had not proved his claim and the Commissioner of Labor and Industry dismissed the petition. The County Court affirmed. On our motion we certified petitioner's further appeal before the Appellate Division acted upon it. As will hereafter appear, there were further proceedings in the labor department which led to a delay in the determination of this appeal. After those proceedings were concluded, both parties requested a decision without further argument.

On September 18, 1951 petitioner met with an industrial accident resulting in a herniated disc and on March 19, 1953 he was awarded 12½% of total permanent disability against the employer, Kramer Brothers Freight Lines, Inc. On October 20, 1955, upon a further petition, he received an additional 5% of total. Prior to the accident in question, petitioner was partially disabled by reason of both another accident and some unrelated conditions. It is perfectly clear that the condition which rendered petitioner totally disabled is a bilateral or saddle thrombophlebitis in the lower extremities, the onset of which occurred in the middle of 1953.

Petitioner clearly was totally disabled at the time of the second petition against Kramer Brothers. The serious nature

of the thrombophlebitis, considered against the additional award of 5% on the second petition, sparked the question whether the thrombophlebitis had been found in that proceeding to be unrelated to the last accident or whether it had been undervalued by the Deputy Director. Indeed the limited circumstances revealed in the record as first presented to us suggested the possibility that the second award was in fact the product of a settlement disguised as a trial. The record of the proceedings against the fund supported that possibility because counsel who represented petitioner in that proceeding as well as in the proceedings against Kramer Bros. said:

"But it showed at that time the injured man was in very bad shape and was sort of tentatively understood that he should be awarded the 1% disability because here is a man so badly hurt he cannot get paid and apparently they wouldn't give him 5% more for being hurt."

At the oral argument before us the same counsel for petitioner, in response to a direct inquiry, asserted the award of 5% was in fact a settlement made with the understanding that the One Per Cent Fund would be visited with the burden, and this despite the palpable fraud upon the Fund that such an understanding between employee and employer would plainly accomplish. We directed further argument with respect to the binding effect of the compensation award in favor of or against the One Per Cent Fund. In the meantime the transcript of the second proceeding against Kramer Bros. became available and was made part of the record before us. In his supplemental brief, counsel for petitioner said:

"Referring to this record we find there was a very limited presentation of petitioner's case by his counsel. It is apparent and counsel here state that the determination there was a settlement. * * *

During the negotiations which proceeded [sic] the hearing, it was agreed by all parties, including the deputy commissioner· involved, that petitioner would next proceed against the Fund. * * *"

The record of the second proceeding does not support the quoted statement. In fact the Deputy Director in that proceeding found:

"After carefully listening to all of the doctors testifying here today, there is no doubt and I must so find 'that the petitioner is now totally and permanently disabled; that this total and permanent disability was brought about because of many intervening conditions from which the petitioner suffered, most of which are in no was related to the accident of September 18, 1951, either by way of causation, aggravation or exacerbation.

I feel I am justified in making such a finding in spite of the paucity of proof and poor presentation on behalf of the petitioner of this case."

The testimony in that proceeding shows that the relation of the thrombophlebitis to the Kramer Bros. accident was litigated. In that hearing, Dr. Jack Blumberg and Dr. S. Wolf Emmer, called out of turn for respondent and before petitioner's witness Dr. Samuel L. Spinner took the stand, testified the thrombophlebitis was unrelated to the accident. Dr. Spinner mentioned the thrombophlebitis on direct examination in a way to suggest what was developed on cross, to wit, the absence of any causal connection.

There can be no doubt that in the proceeding against Kramer Bros. the thrombophlebitis was adjudged not to be related to the accident, and it having originated after the accident, the finding negated a basis for a claim against the One Per Cent Fund. The finding of course coincides with the finding made by the Commissioner and the County Court in the proceedings before us for review. We are not disposed to overturn that finding of fact, and hence need not consider the question whether the finding against petitioner in the proceeding against the employer forecloses as a matter of law a contrary assertion against the Fund on the principles of either res judicata or collateral estoppel.

When the issue of "settlement" and its impact upon the claim against the Fund was raised at the oral argument before us, the suggestion was made that the Kramer Bros. proceeding might be reopened to the end that the burden

fall where it properly belongs if the thrombophlebitis resulted from the accident. Petitioner then sought to reopen, and being advised of that effort, we withheld our decision of this case. What then happened should be recounted, although our determination does not depend upon it. Upon that further hearing, counsel for petitioner did not testify in support of his assertion that the 5% award was the product of a settlement. In fact, he stayed away from the hearing while representatives of Kramer Bros. and the Deputy Director who made the determination under attack were present, prepared to testify. It further appeared that counsel for petitioner, at the time of the second petition against Kramer Bros., had in his file reports of Drs. Arthur Colley and E. V. Robertson indicating an opinion that the thrombophlebitis was related to the accident, but counsel did not call them in that proceeding despite the fact that his petition squarely asserted a causal connection. He, however, did call them in the proceeding against the Fund in an effort to establish that very connection.

The Deputy Director refused to reopen the Kramer Bros. proceedings on several grounds. He dealt exhaustively with the claim of a settlement and found it to be false. He found further that the issue of the relationship of the thrombophlebitis to the accident was pleaded, litigated and in fact determined adversely to petitioner in the Kramer Bros. matter, a finding we also made above. Lastly, the Deputy considered the evidence he heard anew with respect to the issue of causal connection. It appears that the thesis of Dr. Colley and Dr. Robertson was that the operation of December 1951 addressed to the herniated disc introduced a trauma affecting the nerve fibers connected to the spinal cord which in turn affected the well-being of the blood vessels in the lower extremities. Against this view, there was an array of expert testimony (including that of the operating surgeon and attending orthopedic specialist) to the effect that the thrombophlebitis did not manifest itself during the post-operative period in which it would have appeared on

petitioner's thesis, but rather followed and was referable to a lengthy period of hospitalization in 1953 for a urological condition unrelated to the accident or was attributable to that condition itself. The Deputy found the respondent's evidence to be more persuasive, thus adding another factual finding against petitioner. No appeal was prosecuted from the judgment entered on those findings.

The judgment is accordingly affirmed.

BURLING, J. (dissenting). Because the majority in this case denies the existence of a causal relationship between appellant's thrombophlebitis and the last compensable accident suffered by him on September 18, 1951, while he was in the employ of Kramer Brothers Freight Lines, Inc., I find I must dissent from their views. To my mind, the record in this case discloses that such a relationship exists, and in so holding I do not believe myself to be at variance with either the Commissioner of Labor or the County Court below, or with the decision of the Deputy Director rendered on the occasion of the first reopening of the award against Kramer Brothers. Moreover I do not perceive any other bar to a claim against the One Per Cent Fund and hence I would reverse the direction of dismissal entered against appellant in the County Court.

There is no substantial dispute concerning the fact that the appellant is presently totally and permanently disabled. The question is to what, if any, extent the One Per Cent Fund may be resorted to for his injuries.

The appellant's medical and workmen's compensation injury history supplies the essential background against which the determination in the instant cause must be made.

Prior to sustaining any compensable industrial accident the appellant suffered from a left inguinal hernia condition. A herniotomy was performed to correct this condition on August 23, 1950. The appellant was also afflicted with an unspecified congenital defect. While this latter affliction formed one of the bases upon which the Deputy Director

below rested his finding of present total permanent disability, the only reference thereto in the record stems from a recitation of facts in the appellant's first compensation award in February of 1946.

That award reads in part as follows:

"4. Dr. S. L. Spinner testified for the petitioner that it was his opinion that the petitioner was entitled to permanent disability of 10% of total as the result of accident described although originally he had estimated disability of 30% of partial total but in view of certain congenital conditions he felt that disability of 10% of total as a result of the accident is advised."

The 1946 award of compensation resulted from an industrial accident incurred on June 12, 1945. At that time the appellant was employed by Anheuser-Busch, Inc. He received an injury which caused him pain in the lower portion of his back and on the basis of this orthopedic injury appellant was awarded 6% of total disability.

Thereafter, on September 18, 1951, appellant suffered a second industrial injury while employed as a freight handler for Kramer Brothers Freight Lines, Inc. While loading freight appellant felt a sharp pain in his back. The condition persisted and was subsequently diagnosed as a herniated disc. He was hospitalized and operated upon for this condition. In workmen's compensation proceedings against his employer, Kramer Brothers Freight Lines, Inc., appellant on March 19, 1953 was awarded 12½% of permanent disability based upon the post-operative effects of the herniated disc. He has not been employed since the date of the second industrial accident.

Appellant was again hospitalized from July 1953 until August 1953, complaining of pain in both lower extremities and in both lumbar areas. In September 1953 upon re-admission to the hospital this condition was diagnosed as thrombophlebitis of the left leg. In February and March of 1954 appellant's physical condition required further hospitalization and, at this time, it was found that he suffered

from thrombophlebitis of both legs, denominated "saddle thrombosis."

Between the date of the second industrial accident, September 18, 1951, and the present application for benefits under the One Per Cent Fund, April 13, 1956, the appellant suffered several independent and non-compensable malfunctions necessitating hospitalization and surgical services. During January and February 1954 he required hospital treatment for a foot condition, diagnosed as cellulitis of the dorsum of the right foot and web space. On April 25, 1955 he was operated upon for a strangulated hernia on his right side. On October 25, 1955 the appellant again underwent surgery, this time for removal of hemorrhoids.

By 1955 it became apparent that appellant's overall disability was total. Therefore, in that year within the statutory time he commenced proceedings to reopen the award for his accident of September 18, 1951 ($12\frac{1}{2}\%$ of total disability) against Kramer Brothers Freight Lines, Inc. By Determination of Facts and Rule for Judgment dated October 20, 1955, the Deputy Director increased the amount of that amount by 5% of total disability, although he determined that the appellant at the time was totally and permanently disabled from all causes. The pertinent portion of that award provides:

"6. The permanent disability resulting from said accident is as follows: Orthopedic and neurological in nature, a ruptured intervertebral disc and his over all disability from all causes amounts to 100% of total and I find that the extent of the increase of his disability from this accident amounts to 5% of total."

Thereafter, on April 13, 1956, the appellant instituted this proceeding for benefits under the One Per Cent Fund.

It is the duty of this court in reviewing litigation arising under the Workmen's Compensation Act to make independent factual determinations on the basis of a study of the entire record giving due regard to the opportunity of the hearer of the evidence to judge the credibility of the witnesses.

*Russo v. United States Trucking Corp.,* 26 *N. J.* 430 (1958) ; *Ricciardi v. Marcalus Mfg. Co.,* 26 *N. J.* 445 (1958). The record in this case is that made before the Deputy Director on the hearing on the One Per Cent Fund application below. It discloses ample testimony supporting a finding of a causal relationship between the thrombophlebitis and the 1951 accident. Both Dr. Colley and Dr. Robertson, testifying for appellant, supported the existence of such a causal relationship. Dr. Spinner in response to a statement of the Deputy Director that the thrombophlebitis and the 1951 accident were not related answered: "I don't think so. Although nobody knows what thrombophlebitis comes from." These quoted sentences are the only source for a conclusion on the causal relationship point contrary to appellant. Compared with the definite statements of the other medical experts contradicting it, it carries little weight. Some indication of the state of the record may be discerned from the following statement made by the attorney for appellant's adversary near the conclusion of the hearing below:

"Definitely the weight of the medical testimony here presented is that the thrombophlebitis was causally related to it [the 1951 accident] and came into being after the herniated disc."

Thus it is my conclusion that the causal relationship denied by the majority did exist as demonstrated by a consideration of the record below. Nor does this necessarily conflict with the findings below. Neither the County Court nor the Commissioner whose findings were based on the Advisory Report of the Deputy Director made any mention of a relationship between the thrombophlebitis and the 1951 accident. In its findings, the County Court stated:

"The facts in this case definitely indicate that at the time of petitioner's last compensable accident, September 18, 1951, he was not wholly disabled, and according to the briefs, did not become so until about two years later."

Under these circumstances, the County Court held that *N. J. S. A.* 34:15–95(*d*) was applicable and that the petition

should be dismissed. It would appear, therefore, that the County Court's action was based on the belief that *N. J. S. A.* 34:15–95(*d*) required the total disability to occur immediately upon the happening of the last compensable accident, and not on a failure to demonstrate a causal relationship between the thrombophlebitis and the 1951 accident. On the Division level, the reason for the judgment against appellant is less clear, for the findings there are stated in the form of an ultimate conclusion. But those parts of the Commissioner of Labor's findings and the Advisory Report of the Deputy Director which mention the thrombophlebitis are significant. In the Commissioner's decision it was stated:

"It was concluded by Deputy Director Spair that although the petitioner is totally and permanently disabled, a part of his condition is attributable to the condition of thrombophlebitis *which appeared subsequent to the last compensable accident* suffered by petitioner." (Emphasis supplied)

And in the Advisory Report:

"It appears that the petitioner is totally and permanently disabled as a result of the accident of September 18, 1951, the accident of June 12, 1945, a pre-existing bilateral inguinal hernia, a prior congenital defect  *   *   *  and the condition of thrombophlebitis *appearing subsequent to the last compensable accident*  *   *   *."   (Emphasis supplied)

The italicized phrases suggest that the Commissioner and the Deputy Director discounted the thrombophlebitis for the same reason as the County Court, *i. e.,* that it did not appear immediately upon the occurrence of the 1951 accident. The lack of any express finding negating the causal relationship in question and the weight of the evidence in the record supporting the existence of such a causal relationship further support the conclusion that the finding I make here does not vary with those made below. And there would appear to be no bar caused by the findings of the Deputy Director at the first hearing on the petition to reopen the award against Kramer Brothers based on the 1951 accident. Even assum-

ing that although the Fund is not bound by such a hearing, *N. J. S. A.* 34:15-95.1, the rule of mutuality of estoppel, see *Sbarbero v. Miller,* 72 *N. J. Eq.* 248 (*Ch.* 1908) affirmed 74 *N. J. Eq.* 453 (*E. & A.* 1908) would not apply, the findings of the Deputy Director in relation to the causal connection between the 1951 accident and the thrombophlebitis made on the reopening hearings were not sufficiently definite to allow an estoppel to arise. See *Restatement, Judgments,* § 68, comment 1 (1942). The Deputy Director on that occasion said only that:

"total and permanent disability was brought about because of many intervening conditions from which the petitioner suffered most of which are in no way related to the [last compensable] accident * * *." (Emphasis supplied)

I am not prepared to decide which conditions were referred to by the Deputy Director. I would conclude, therefore, that appellant has adequately demonstrated a causal relationship between the 1951 accident and the condition of thrombophlebitis from which he is suffering.

Before proceeding to a consideration of additional points raised by the parties it might be better to embark upon an inquiry into the general problem which the One Per Cent Fund was designed to solve. Currently some 44 states have the equivalent of our One Per Cent Fund (commonly denominated as second injury funds). See II *Larson, Workmen's Compensation Law* § 59.32, *p.* 59. The following is the classical example, frequently given by the commentators, of the problem which gave rise to the remedial legislation:

A has lost the sight of one eye in an accident. He is therefore rendered 25% totally disabled. He subsequently secured a job with B firm. Due to an industrial accident he loses his other eye, rendering him totally blind, and 100% disabled.

Since A only lost one eye while in the employ of B firm, it might be said that the B firm should only be liable for 25% of total disability.

Prior to the inception of the One Per Cent or second injury funds this problem was handled in one of two ways. Some states adopted apportionment statutes which rendered the employer liable only for the per cent of disability caused by the accident at the employer's firm, the employee bearing the remainder of the burden. Other states, including New Jersey, placed the sole responsibility for 100% total disability on the second employer. *Combination Rubber Mfg. Co. v. Obser*, 95 *N. J. L.* 43 (*Sup. Ct.* 1920) affirmed 96 *N. J. L.* 544 (*E. & A.* 1921).

It would seem that such apportionment favored the employer, while placing the sole responsibility on the employer favored the injured employee. This was not so in practice, however. As *Larson* states:

"§ 59.31. * * * When loss of a single eye might mean a compensation liability of $2000 for a man with two good eyes but $8000 for a man with only one, the compensation insurance premium on the latter would naturally be markedly greater. It has been said, for example, that within the thirty days following the announcement of the nonapportionment rule in Nease v. Hughes Stone Co., between seven and eight thousand one-eyed, one-legged, one-armed and one-handed men were displaced in Oklahoma.

Under either rule, then, the compensation system operated unsatisfactorily in the case of previously-impaired workers; under apportionment, they received far less than their actual condition required to prevent destitution; under nonapportionment they lost their jobs."

To solve the dilemma second injury (or as in this State 1%) funds were adopted. The purpose of these funds was two-fold: (1) to remove the unfair burden from the employer of having to pay for that which he did not cause, and (2) to provide incentive for employers to hire handicapped people. *Richardson v. Essex National Trunk & Bag Co., Inc.*, 119 *N. J. L.* 47 (*E. & A.* 1937). See Governor Edge's First Annual Message to the Legislature (1945) reported in 1945 *New Jersey Legislative Manual*, 689, at p. 694.

In this State the Fund derives its name from the fact that it is created by contributions of 1% of the total compensa-

tion paid each year by mutual associations, stock companies and self-insurers. *N. J. S. A.* 34:15–94.

The One Per Cent Fund had its inception in New Jersey in 1923. *P. L.* 1923, *c.* 81. By judicial construction the statute was read to include only instances where the prior condition resulted from an injury compensable under the Workmen's Compensation Act. *Addotta v. Blunt,* 114 *N. J. L.* 85 (*Sup. Ct.* 1934). This result ignored one of the fundamental aims of the legislation, *i. e.,* to provide a stimulus for the hiring of handicapped workers. As a consequence the Legislature amended the act to cover prior disabilities, whether compensable or not. *P. L.* 1936, *c.* 55. *Richardson v. Essex National Trunk & Bag Co., Inc., supra.* The legislative design was aptly set forth in the *Richardson* case, *supra,* 119 *N. J. L.,* at *pages* 52 and 53:

"It is only natural, in the practical administration of such a complex and relatively new state governmental function as the rehabilitation of injured persons, that unforeseen contingencies should arise from time to time. But we clearly discern in the act of 1936 a continued and progressive development of the law to meet unforeseen contingencies as they arise to the end that full force and effect be given to the objective sought to be accomplished by the state; namely, to make its plan of rehabilitating injured persons workable and a useful reality. That goal can only be accomplished if all affected act in co-operation. The state has done, and is doing, its part; the employe—the direct beneficiary—undoubtedly welcomes the opportunity of engaging in honorable and gainful occupation; but how was the employer to be induced to co-operate? Certainly he could not be induced to co-operate upon a premise that would impose a liability upon him such as was imposed upon the employer in the *Obser* case. Thus the Legislature set out to, and did, eliminate the employer's liability for an accident unrelated to the employment of the injured person. We discern in its legislation of 1936 a clear intent not to impose any greater obligation upon an employer who hires or employs a person previously injured than if he had hired a person not so injured.

The language of the last-stated act fully supports our construction and application thereof. It provides that the State One Per Cent. Fund shall make payments to 'cover *that portion* of the period for which the employer *is not legally responsible due to* the permanent and partial disability suffered or possessed by the employe at the time that the employe sustained the injury as a result of which the employe became totally and permanently disabled.'

(Italics supplied.) This, to us, evinces a definite purpose to exclude liability for disabilities not flowing from the second accident. If it were otherwise, the whole philosophy upon which the State's plan is founded would crumble and fall; it would be rendered nugatory. This clearly was not the purpose of the act of 1936."

This excursion into the general purposes of the legislation is the starting point for the solution of the following problems.

The respondent asserts that subsection (d) of *N. J. S. A.* 34:15–95 precludes the appellant from prevailing. Respondent admits that the uncontroverted proof indicates that appellant was a person who had been previous to the last compensable accident permanently and partially disabled from some other cause. "But, at the same time, he was a person who was actually only rendered permanently, partially disabled by the last compensable injury and became permanently, totally disabled by reason of progressive physical deterioration or pre-existing condition or disease." The essence of respondent's argument is that while the appellant demonstrated a causal connection between the thrombophlebitis condition and the herniated disc injury, he failed to show that the net effect of those conditions, alone and without reference to other causes, which combined with his previous admitted partial disability, caused his total permanent disability. Respondent asserts that:

"his other ailments which arose subsequent to the second accident all of which could have contributed to his 100% disability, cannot be disregarded. Thus, the hernia condition on his right side that uncontrovertedly did not appear until 1953 was not operated on until April 1955. Also, he was treated in 1954 for cellulitis of dorsum of right foot and first web space. Furthermore he underwent an operation in October 1955 for his hemorrhoids. All of these independent conditions arose and were being treated over an extended period of time while he was also undergoing treatment for his thrombo-phlebitis condition. For this, he was hospitalized during 1953 on two occasions in July and September, and in 1954 during February and March.

This medical history occurring subsequent to his second accident, absent proof to the contrary, indicates that the petitioner cannot recover benefits for the reason that there is no showing at all that his permanent, total disability was not caused by progressive physical

deterioration. The only proof offered by the petitioner was that the thrombo-phlebitis condition, in all its forms, did in some way contribute to his 100% disability. But, the petitioner failed to produce any evidence to show that the other conditions which arose subsequent to the 1951 accident did not also have a contributing effect to his present condition at that time. In other words, the petitioner failed to prove before the Agency, or the County Court that, while he became partially, permanently disabled as a direct result of the 1951 accident, he became *totally* disabled solely because of the subsequent effects of that particular accident."

The failure of proof, if it actually exists, would be fatal to appellant's recovery of benefits, although not for the reason assigned by the respondent, *i. e.*, the operation of subsection (d). Rather the reason is to be found in the main section of *N. J. S. A.* 34:15-95 which clearly provides that payments are to be made to persons *"totally* disabled as a *result* of experiencing a subsequent permanent injury."* (Emphasis supplied) Thus, the total disability must result as a consequence of the last compensable injury combined with or superimposed upon prior disabilities, and not from independent noncompensable conditions arising subsequent to the last injury.

But it is clear that the appellant has sustained his burden of showing that the herniated disc injury and its consequent thrombophlebitis when combined with his previous injuries, resulted in total permanent disability without regard to his subsequent afflictions. The following is a portion of the testimony from Doctor Bufford on this question:

"Q. What is your diagnosis? A. The presence of the wide-spread vascular disorder, the orthopedic disability and bilateral hernia, in my opinion, constitute sufficient evidence for total disability.
Q. Total disability? A. Yes.
The Deputy Director: As to what, Doctor? What condition?
You just read it, I think, when you referred to the vascular disorder, does that include thrombo-phlebitis?
The Witness: Yes. That is the vascular condition."

Moreover, the Deputy Director specifically found that five causes contributed to the appellant's total disability. His conclusion on this point is as follows:

"It appears that the petitioner is totally and permanently disabled as a result of the accident of September 18, 1951, the accident of June 12, 1945, a pre-existing bilateral inguinal hernia, a prior congenital defect (which is not more accurately specified), and the condition of thrombo-phlebitis appearing subsequent to the last compensable accident of September 18, 1951."

I concur in the above conclusion of the Deputy Director. The subsequent foot condition, strangulated hernia and hemorrhoid operation, whatever their added effects may be, need not be taken into consideration for the reason that the other conditions alone sustain a finding of total disability.

Respondent next contends that, assuming that the consequences of the second injury when combined with the prior disabilities produced total permanent disability, subsection (d) still forecloses recovery from the One Per Cent Fund. He argues that the results of the second injury must immediately produce a total and permanent disability and that a two-year delay in the manifestation of the crippling effects of the injury (the thrombophlebitis) renders it "a progressive physical deterioration" within the meaning of subsection (d). It would be a sufficient answer to reiterate the language of the court in *In re El,* 18 *N. J. Misc.* 348, 349 (*Com. Pl.* 1940), modified on other grounds 125 *N. J. L.* 150 (*Sup. Ct.* 1940), affirmed *per curiam* 125 *N. J. L.* 510 (*E. & A.* 1941):

"There is no provision that the total disability must occur simultaneously with the 'subsequent permanent injury' nor that it shall occur 'immediately thereafter.' Such a limitation would be illogical, for we know by common knowledge and experience that the effects of traumatic injuries are not to be reliably gauged by manifestations evinced simultaneously with the accident, or 'immediately thereafter.' "

There is, however, a further and more fundamental reason why subsection (d) does not apply to bar a recovery under the circumstances of this case. The four provisos (a) through (d) of *N. J. S. A.* 34:15–95 relate to situations where either the prior or subsequent disabilities, of and by themselves, result, under operative notions of causation in Workmen's

Compensation Law, in total and; permanent disability. As previously noted, one of the basic purposes of the One Per Cent Fund was to remove what was considered an unfair burden from the employer. It was not, however, intended to alleviate his responsibilities where the industrial accident suffered under his employ was a competent producing cause of the entire disability. *In re Glennon,* 18 *N. J. Misc.* 196 (*Com. Pl.* 1940); *Balash v. Harper,* 3 *N. J.* 437 (1950).

Thus, under subsection (a) the subsequent employer is not relieved from legal responsibility where the accident suffered in his employ "and irrespective of any previous disability constitutes total and permanent disability." An illustration of this principle is provided by a Tennessee case under its apportionment statute. *Knoxville Knitting Mills Co. v. Galyon,* 148 *Tenn.* 228, 255 *S. W.* 41, 30 *A. L. R.* 976 (*Sup. Ct.* 1923). There a claimant had previously lost three fingers of his left hand. He thereafter incurred an industrial injury which resulted in the loss of his entire left hand. The court refused apportionment since the total effect of the injury would have been the same if the man had not previously lost his fingers. See also II *Larson, supra,* § 59.20, *p.* 58.

Subsection (b) provides that where total disability results from "aggravation, activation or acceleration, by the last compensable injury, of a pre-existing noncompensable disease or condition" no benefits shall be received from the fund. Justice Wachenfeld concisely expressed the underlying idea of employer responsibility in this area in *Marshall v. C. F. Mueller Co.,* 135 *N. J. L.* 75, at *page* 78 (*Sup. Ct.* 1946) where he observed:

"It is not essential under our Workmen's Compensation Act, *N. J. S. A.* 34:15–1 *et seq.,* that the employee be in perfect condition prior to the accident. The employer takes his employees with their mental, emotional, glandular and other physical defects or disabilities, *Bernstein Furniture Co. v. Kelly,* 114 *N. J. L.* 500; affirmed 115 *N. J. L.* 500, and where a pre-existing disease is caused to become active or to flare up and injury results therefrom, the same is compensable and it is not necessary that the accident

should be shown to be the sole contributing cause of the injured condition of the employee."

The existence of a prior latent defect which is "lighted up" by a subsequent compensable injury is not sufficient to relieve the employer of responsibility; as a consequence the employee must seek redress from his employer and not from the One Per Cent Fund. *In re Glennon, supra; Vandenberg v. John DeKuyper & Son,* 5 *N. J. Super.* 440 (*App. Div.* 1949); *Davenport v. Alvord Hotel,* 21 *N. J. Super.* 493 (*Cty. Ct.* 1951). Subsections (c) and (d) of *N. J. S. A.* 34:15–95 encompass situations where total permanent disability is not manifested until sometime after the injury.

Subsection (c) provides that if the prior disability is in itself progressive and "by reason of such progression *subsequent* to the last compensable accident" (emphasis supplied) renders an employee totally disabled he cannot recover from the fund. Justice Oliphant in *Balash v. Harper, supra,* recognized that the progression of the disease must independently render the employee totally disabled before his resort to the Fund is cut off. He held as follows:

"Subdivision (c) only defeats a claim if the disease is progressive and the progression of the disease of and by itself subsequent to the last compensable accident * * * renders the applicant totally disabled." 3 *N. J.,* at *page* 441.

Subsection (d), the provision here in controversy, must take meaning from the subsections preceding it and from the enunciated general principles of the entire section. Subsection (d) provides that where a person who "is rendered permanently, partially disabled by the last compensable injury subsequently becomes permanently totally disabled by reason of progressive physical deterioration or pre-existing condition" he cannot recover from the Fund. Subsection (d) is simply the converse of subsection (c); the latter providing for instances where the progression is that of the prior disability and the former providing instances where the last compensable injury is progressive. In both situa-

tions, however, in order to preclude recovery it must be shown 'that the progressive condition independently produced total disability. But where, as here, it is shown that a total permanent disability arises subsequent to the last compensable injury and that standing alone and without regard to prior disabilities the injury and its resultant delayed effects do not produce total disability, the employee may receive benefits from the Fund.

Accordingly I would hold that the petitioner is entitled to recover benefits under the One Per Cent Fund, *R. S.* 34:15-95 as amended.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS and PROCTOR—4.

*For reversal*—Justice BURLING—1.