280 N.J. Super. 96 (1995)
654 A.2d 987
GEORGE V. GULICK, PETITIONER-RESPONDENT,
v.
H.M. ENOCH, INC., RESPONDENT-APPELLANT,
v.
THE PROCTOR COMPANY, RESPONDENT-RESPONDENT,
v.
THE SECOND INJURY FUND, RESPONDENT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued January 25, 1995.
Decided March 8, 1995.
*101 Before Judges SHEBELL, SKILLMAN and KLEINER.
Sheldon Schiffman argued the cause for respondent-appellant, H.M. Enoch, Inc. (Fred S. Brause, Jr., attorney; Mr. Schiffman, on the brief).
David N. Fiveland argued the cause for petitioner-respondent, George V. Gulick (Kirsch, Gelband & Stone, attorneys; Mr. Fiveland, on the brief).
Francis T. Giuliano argued the cause for respondent-respondent, The Proctor Company (Mr. Giuliano, of counsel, and Mr. Giuliano and David P. Kendall, on the brief).
Cheryl B. Kline argued the cause for respondent-respondent, The Second Injury Fund (Deborah T. Poritz, Attorney General of New Jersey; attorney; Joseph L. Yannotti, Assistant Attorney General, of counsel; Ms. Kline, Deputy Attorney General, on the brief).
The opinion of the court was delivered by SHEBELL, P.J.A.D.
Appellant-respondent, H.M. Enoch, Inc. (Enoch), appeals from a final judgment of the Division of Workers' Compensation entered on June 23, 1993, which awarded petitioner-respondent, George V. Gulick, "100% total and permanent" disability based on three days of exposure to pulmonary irritants while in Enoch's employ as a plumber. Enoch also appeals the concurrent dismissal of the claim it impleaded against Gulick's prior employer, The Proctor Company (Proctor), and the April 2, 1993 dismissal of the claim it *102 impleaded against the Second Injury Fund (Fund). We reverse and remand.
Petitioner filed a claim petition on November 3, 1988, naming as the only respondent, Enoch, alleging "[o]ccupation exposure to dirt, dust, fumes [AND] building materials" from 1950 to November 20, 1987, resulting in "total disability resulting from pulmonary disease." On August 6, 1990, trial commenced with petitioner testifying that he worked as a pipefitter and plumber from 1950 to 1987. He maintained that he was subjected to dusty working conditions while working as a plumber and pipefitter in commercial buildings and homes. Over the years, his work involved mixing asbestos, covering boilers with asbestos, use of asbestos blankets, and removal of asbestos and other insulation. Removal of the insulation left particles in the air, causing dusty conditions. Petitioner also worked in chemical factories several weeks a year, where the air was heavy, almost greenish, and smelled bad. He sometimes worked with welders, subjecting him to smoke from the welding and from smoldering asbestos. Work at oil refineries exposed petitioner to dusty, "filmy" air that smelled bad. Petitioner did not wear a mask while working.
Petitioner worked three full days for Enoch on November 18, 19, and 20, 1987, installing refrigeration and heat lines. The work also included removing asbestos. The air was very dusty and dirty. Petitioner suffered from shortness of breath and had begun to spit up blood a short time before commencing his work at Enoch. He had last worked at Proctor, several weeks before the Enoch job. His symptoms while working at Enoch were described as worse than they had previously been. At the Enoch job-site, petitioner found that he was unable to climb scaffolds and carry equipment. He lost his breath and spit up blood.
Petitioner had smoked cigarettes for thirty-five to forty years, but stopped smoking before working at Enoch. He was twice hospitalized for bilateral pneumonia between 1979 and 1980. He gave a history of being treated for emphysema for two years prior to the second pneumonia bout. Petitioner did not consult his *103 doctor between 1980 and 1986. During this period, petitioner worked approximately ten months a year. Petitioner first visited Dr. George Sollami, a pulmonary specialist, shortly before working at Enoch, because he was spitting up blood. At this visit, on November 2, 1987, according to Dr. Sollami, petitioner provided Dr. Sollami with a prior history of hypertension, severe osteoarthritis, removal of a cyst behind his right ear, a tic involving his left eye, and back and head injuries. He also gave the following pulmonary related history:
He was an active one-pack per day cigarette smoker for forty years and came to me primarily with the chief complaint of exertional dyspnea.
He reported to me that at the time of my initial visit he could walk only two blocks without experiencing shortness of breath, and after exposure to dust or fumes or exposure to extremes in temperature, he did note that his breathing was worse.
He also stated to me that over the last five years he was told of the diagnosis of emphysema and had been admitted to Community Memorial Hospital under the care of Dr. Cristal for treatment of bilateral pneumonia.
He has also reported to me that he noted occasional expectoration of blood and had been treated with medication called Theodur, one hundred milligrams twice daily for pulmonary reasons and stated to me there was little improvement in his respiratory complaints with treatment.
Petitioner told Dr. Sollami that he was working six months out of the year through his union, that he had been out of work for three weeks prior to the visit, and that he drank six cans of beer a day. The doctor found that petitioner was suffering from pulmonary problems. A chest X-ray revealed "interstitial markings, primarily at the bases. There were no pleural or diaphragmatic calcifications noted." A pulmonary function study performed in the doctor's office revealed "a very severe obstructive ventilatory defect, and there was no improvement noted post bronchodilator."
Dr. Sollami's conclusion as to petitioner's condition was:
On the basis of the examination, chest X-ray and the review of the pulmonary function studies, it was my impression that the patient had evidence of advanced chronic obstructive pulmonary disease, primarily chronic bronchitis.
In addition there was evidence of fibrotic lung disease, which I felt mostly was on the basis of asbestosis, but also considered was scar tissue related to his previous *104 pneumonia. He has a  had evidence of hypertension, osteoarthritis and chronic alcohol use.
* * * * * * * *
In addition, it was clear to me that his occupation as a pipefitter caused him to be exposed to agents which were triggering his lung problem, and I therefore advised that he consider applying for disability, as it was my impression he should be considered fully disabled on the basis of my findings.
Dr. Sollami explained his opinion that petitioner was totally disabled as of November 2, 1987:
Considering the fact that he worked as a plumber and pipefitter primarily  as far as I know at this point, I believe that's the sole work that he performed over the years, and it was my opinion that he should no longer work as a plumber or pipefitter because of his degree of pulmonary dysfunction, exposure to dust fumes, having to work in conditions which would expose him to extremes in temperature, humidity, all of these factors were factors which were triggering his respiratory complaints.
In addition, he had been exposed to asbestos dust, and in my opinion he had evidence of asbestos-related pulmonary disease. He should no longer be exposed to asbestos dust.
So my opinion is he was fully disabled in regards to his employment as a plumber and pipefitter or any other job that would cause him to be exposed to those conditions, those environmental conditions which were triggering his complaints.
Dr. Sollami felt that petitioner's symptoms during his employment at Enoch were consistent with his opinion that petitioner was fully disabled. In regard to petitioner's exposure during his employment at Enoch, the doctor opined:
I do not believe that the symptoms that he had reported or the exposure that he undergone during that period of time resulted in a permanent  any further permanent injury. It's in keeping with my medical opinion that he had  prior to that employment, he had evidence of advanced chronic lung disease. The employment simply was triggering his symptoms relating to the preexisting disease. In other words, the symptoms represented an exacerbation of his disease.
On cross-examination, Dr. Sollami explained:
I'd rather use the terminology, his symptoms were exacerbated by the employment for those three days. I'd like you to look at his  at George Gulick as having a preexisting condition, being chronic obstructive lung disease, and during that period of time when he was exposed to dusts and fumes, he was  he had to perform strenuous activities. That employment resulted in an exacerbation of his symptoms, it triggered his symptoms.
*105 He added: "I would have to conclude that these symptoms represented a transient exacerbation of his underlying lung disease and in all likelihood, this exacerbation did not lead to any further permanent lung injury." In fact, the doctor related that petitioner's symptoms improved between the examination prior to employment at Enoch and the December 10, 1987 examination following that employment.
Dr. Sollami acknowledged that he could not pinpoint the onset of petitioner's condition and that petitioner's various employments over the years added to the progression of his condition. Petitioner did not relate to Dr. Sollami any complaints regarding his previous employment at Proctor.
During the December 10, 1987 visit, petitioner informed Dr. Sollami that he had been out of work since November 20 for medical reasons. "He stated that since that time he noted an improvement in his shortness of breath and an improvement in his cough, and he noted this improvement after being out of work and also coinciding with the use of inhaled bronchodilators." The doctor found petitioner's condition "essentially unchanged" from the first examination, although his symptoms had improved. The doctor noted that since retiring, petitioner's condition had further deteriorated. Petitioner later developed a cardiac arrythmia, gastritis and colon polyps.
Dr. Susan Daum, a diplomate of the American Boards of Internal Medicine and of Preventive and Occupational Medicine, examined petitioner on March 9, 1988. She was the only doctor called to testify on his behalf. Her examination revealed cyanosis of the lips and tongue, indicating that petitioner was not getting enough oxygen from his lungs to these areas. However, petitioner's respiratory rate, blood pressure, pulse, and chest configuration were normal. His airways were found to be somewhat obstructed, and X-rays revealed pronounced lung markings in the lower chest. The doctor concluded that "the most visible disease is chronic obstructive pulmonary disease in the form of increase *106 bronchovascular finding and low diaphragms." Pulmonary function tests revealed "severe obstructive impairment."
Dr. Daum also reviewed petitioner's previous medical records, Dr. Sollami's report, and the 1980 hospital records pertaining to his pneumonia, which revealed an underlying diagnosis of emphysema and respiratory impairment. Dr. Daum's final diagnosis was permanent and progressive chronic bronchitis, chronic obstructive pulmonary disease, and emphysema. She concluded that this rendered petitioner permanently and totally disabled for physical labor. When asked whether she had an opinion "as to whether there is any causal relationship between the employment petitioner had at the H.M. Enoch Company and the pulmonary disease that you found in this individual," Dr. Daum answered: "No, Enoch is the last." Upon further questioning, she answered:
Well, he was exposed to things at Enoch not to the kind of things he had been exposed throughout his life, and therefore, it is my opinion that the exposures contributed to his overall disability. It is my understanding that he had a great deal of difficulty working at Enoch and was really extremely short of breath and unable to do much of the work, so he was already rather severely disabled at the time.
But you know each accumulative exposure contributes some damage to the lungs in terms of dust, fumes and irritants to somebody in his trade would normally experience, which are like cement dust and asbestos dust and welding fumes.
When asked when petitioner became totally disabled, Dr. Daum answered: "On that last job, after that three days, he clearly could not do physical work."
On cross-examination, Dr. Daum acknowledged that Dr. Sollami's pulmonary function findings made prior to petitioner's employment at Enoch were worse than her own findings, which were made subsequent to the Enoch employment. In response to respondent's question as to whether these findings in conjunction with her conclusion that petitioner was totally disabled following employment at Enoch, indicated that petitioner was totally disabled prior to the Enoch employment, she responded:
Depending on his complaints and my physical findings and whether or not he had acute respiratory infection, I would have to make a judgment on that basis of that type or examination on that day, a lung function study, COP varies greatly, so I can't really  I can't really say. Also, the lung function tests don't fully reflect how *107 much the patient can do, and this guy obviously worked till the last point he could do it, and he could do it a few weeks earlier and he couldn't do  do you know who was the last employer before that? I don't remember the exact dates. The prior job he could do, and this job he couldn't, you know. When people die of chronic lung disease, we don't see a progressive change in the spirometry  I can't say how much more disabled he was. Clearly he still was able to work after that examination.
She was asked to separate the pre-existing disability from that sustained at Enoch, and responded:
I will make an attempt to do so. I can't base it on anything but experience because it's not exactly scientific.
I can say he was 95 percent disabled before he went to his last job and did the last 5 percent, it's a rough estimate, it's really not scientific.
* * * * * * * *
I can't do that in terms of reasonable medical probability, I have no idea. All I know is he could work one week and he couldn't work the next time.
Respondent Proctor presented the testimony of Dr. Jack S. York, who examined petitioner on July 22, 1991. The examination of this internist revealed findings similar to those of the two experts who had testified earlier. He gave the following opinion:
I estimated disability at 30 percent of total for his pulmonary pathology, which included the bronchitis and the asbestosis and pulmonary fibrosis of which at least 7 and 1/2 to ten percent of total resulted from chronic cigarette smoking not related to work.
Dr. York testified that a man with thirty percent disability is not able to do heavy work such as plumbing and that the combination of petitioner's pulmonary and cardiac disabilities possibly rendered him totally disabled. He added:
Here we have a man who worked 45 years as a plumber for many different employers. He was exposed to dust fumes, and in the past to asbestos. Then we come to employment of only several weeks, 100 hours, for the Proctor company, but apparently there was no asbestos exposure, and even if there was, the time interval between 1987 and my exam would show no evidence because it takes at least eight to ten years after the asbestos exposure for it to become  manifest on x-rays. So I feel that if he was exposed to some dust and fumes while working for Proctor Company, it was extremely minimal in the overall picture. Any percentagewise, I would say one percent or less due to this very short period of exposure.
He testified that each minimal exposure to pulmonary irritants would contribute to the total disability. With respect to the three days of exposure at Enoch, Dr. York stated:

*108 I think with a three-day exposure, I don't care how severe it is, there will be minimal, very minimal that I couldn't measure, to say a bronchitis. He might temporarily cough, have some shortness of breath and find some difficulty  but for permanent disability, I think in this overall picture, it would be very, very minimal. I couldn't measure it.
Enoch presented the testimony of Dr. David Scott, a specialist in internal medicine and cardiology, who examined petitioner on March 20, 1990. Dr. Scott found petitioner's lung disease to be moderately severe, but estimated that disability to be fifteen percent of total, which he related to petitioner's cigarette smoking. In Dr. Scott's opinion, petitioner's three days of work at Enoch did not have a permanent effect on him. However, he conceded on cross-examination that each employment from 1980, including his last employment, contributed to some degree to the increase in the disability.
The judge of compensation relied on the following in assessing full liability against Enoch:
Although petitioner had experienced coughing for ten to fifteen years, it was at Enoch that shortness of breath and coughing intensified to the point where petitioner was forced to discontinue working. At Enoch, petitioner could not carry anything heavy due to loss of breath. Petitioner began coughing up blood climbing a three-story scaffold. According to petitioner, this was the first instance where difficulty breathing and coughing interfered with his ability at work. After three days, petitioner discontinued working at Enoch.
* * * * * * * *
This Court has great difficulty with the testimony of Dr. Sollami that the three days of occupational exposure at Enoch only caused a temporary exacerbation of his chronic obstructive pulmonary disease. This type of pathology is insidious and the rate of progress of advancement of this pathology is difficult to determine. The doctor testified that petitioner was permanently disabled when he first saw him on November 2, 1987. However, it was obvious that the petitioner did not consider himself totally disabled. He went to work for Enoch for three days after the doctor's November 2, 1987 examination. At Enoch, petitioner worked for eight hours each day and there was considerable exposure to pulmonary irritants. This was the first time that petitioner could not continue his employment due to shortness of breath and coughing. There was also considerable expectoration of blood at the Enoch job.
I was most impressed with the medical testimony of Dr. Daum, the petitioner's medical expert, during this trial. I consider her testimony to be medically persuasive and I rely upon it. Dr. Daum's diagnosis was chronic bronchitis, chronic obstructive pulmonary disease and emphysema. Dr. Daum was of the *109 opinion that petitioner became totally disabled after the three days work with Enoch. Petitioner clearly could not do physical work after this. Dr. Daum testified that petitioner was already severely disabled when he went to work for Enoch, but each successive accumulative exposure, including exposure at Enoch, contributed some damage to the lungs in terms of dust, fumes and irritants that petitioner would be exposed to.
This petitioner has been exposed to asbestos during many years of employment in his occupation. There are findings on x-ray that indicate exposure to asbestos. However, I am satisfied that the pulmonary pathology that renders this petitioner totally and permanently disabled is chronic bronchitis, chronic obstructive pulmonary disease and emphysema.
Applying Bond v. Rose Ribbon & Carbon Mfg. Co., 42 N.J. 308, 200 A.2d 322 (1964), affirming 78 N.J. Super. 505, 189 A.2d 459 (App.Div. 1963), the judge held:
Although the petitioner had severe advanced pulmonary pathology when Dr. Sollami examined him on November 2, 1987, I am not at all satisfied that petitioner was totally and permanently disabled as a result of his pathology on that date. Apportionment cannot be considered as there are no medical proofs before the Court to arrive at apportionment in terms of reasonable medical probability.
It is clear however that petitioner was totally and permanently disabled after the three days of exposure at Enoch. Working capacity and manifest loss of physical function were present after Enoch. Bond, Id., [at] 311 [200 A.2d 322]. Additionally, Dr. Daum examined petitioner on March 9, 1988 and found petitioner to be totally and permanently disabled on that date.
Enoch raises three issues on appeal: (1) Petitioner failed to show that his employment at Enoch was a substantial cause of his disability; (2) The compensation judge erred in failing to assign liability against the Second Injury Fund; and (3) Petitioner is not entitled to compensation under N.J.S.A. 34:15-30 because petitioner's disability was caused by willful self-exposure to a known hazard.
Appellant's assertion of a defense under N.J.S.A. 34:15-30 is clearly without merit. R. 2:11-3(e)(1)(E). Enoch had the burden of proving petitioner's "willful self-exposure to a known hazard." Cf. Bolger v. Chris Anderson Roofing Co., 112 N.J. Super. 383, 394, 271 A.2d 451 (Cty. Co. 1970), aff'd, 117 N.J. Super. 497, 285 A.2d 228 (App.Div. 1971). Dr. Sollami's testimony that he advised petitioner to avoid further exposure to asbestos dust was plainly insufficient to excuse the employer for disability caused by *110 the employee's regular work duties. Moreover, we find no indication in the record that Enoch pursued this defense at trial.
Turning to the more complex issue of how the responsibility of the parties for petitioner's disability should be assessed, we first note our disagreement with the judge's underlying premise that this case falls within the Bond rule. See Bond, supra, 42 N.J. at 311, 200 A.2d 322. Bond involved a dispute between two insurance companies over coverage for an employee's disability due to tuberculosis. The first insurance company was on the risk when a tentative diagnosis was made. Before the diagnosis was confirmed the employee received medical treatment and returned to the job. The second insurance company was on the risk when the diagnosis was confirmed. Recognizing that it was impossible to pinpoint the onset and rate of progression of the disease, the court chose to hold liable "that employer or carrier during whose employment or coverage the disease was disclosed ... by medical examination, work incapacity, or manifest loss of physical function." Bond, supra, 42 N.J. at 311, 200 A.2d 322.
In Giagnacovo v. Beggs Bros., 64 N.J. 32, 311 A.2d 745 (1973), the Bond rule was clarified to the extent that the court declared that a disability is apportionable to an employer when "fixed, arrested and definitely measurable." Id. at 38, 311 A.2d 745. See also Brooks v. Bethlehem Steel Co., 66 N.J. Super. 135, 168 A.2d 670 (App.Div.), certif. denied, 36 N.J. 29, 174 A.2d 657 (1961); Bucuk v. Edward A. Zusi Brass Foundry, 49 N.J. Super. 187, 139 A.2d 436 (App.Div.), certif. denied, 27 N.J. 398, 143 A.2d 9 (1958); Cusatis v. American Cyanamid, 176 N.J. Super. 329, 423 A.2d 316 (App.Div. 1980); Masko v. Barnett Foundry & Machine Co., 53 N.J. Super. 414, 147 A.2d 579 (App.Div.), certif. denied, 29 N.J. 464, 149 A.2d 859 (1959). The Bond rule might well call for the imposition of liability for petitioner's total disability on Enoch, as the last employer, if the condition was not discovered or had not reached "a compensable stage" prior to the last employment. Giagnacovo, supra, 64 N.J. at 37-38, 311 A.2d 745. But prior to petitioner's employment by Enoch, his condition was obvious, *111 diagnosed and capable of measurement. It was, therefore, error to disregard the prior disability and to impose the entire burden of total disability on Enoch merely because Enoch was the last employer. The prior condition did not need to constitute total and permanent disability to be deemed subject to measurement.
N.J.S.A. 34:15-12(d) provides:
If previous loss of function to the body, head, a member or an organ is established by competent evidence, and subsequently an injury or occupational disease arising out of and in the course of an employment occurs to that part of the body, head, member or organ, where there was a previous loss of function, then and in such case, the employer or the employer's insurance carrier at the time of the subsequent injury or occupational disease shall not be liable for any such loss and credit shall be given the employer or the employer's insurance carrier for the previous loss of function and the burden of proof in such matters shall rest on the employer.
[Emphasis Added.]
We must honor the legislative mandate that when a previous loss of function is established by competent evidence, whether compensable or not, the subsequent employer is only liable for that portion of the disability arising out of employment with that employer. See Abdullah v. S.B. Thomas, Inc., 190 N.J. Super. 26, 461 A.2d 1179 (App.Div. 1983). Prior to the 1979 amendments, employers took employees with all of their infirmities and were liable for the entire resulting disability if there was an "aggravation, acceleration or exacerbation of a pre-existing condition." Field v. Johns-Manville Sales Corp., 209 N.J. Super. 528, 531, 507 A.2d 1209 (App.Div.), certif. denied sub nom. Johns Manville Sales Corp. v. N.J. Water Supply, 105 N.J. 531, 523 A.2d 172 (1986). Previously, employers only received credit for earlier loss of function to the body or the same part of the body for which compensation had previously been awarded. L. 1966, c. 126.
N.J.S.A. 34:15-12(d) now grants a credit to the subsequent employer for "previous loss of function ... established by competent evidence" when the previous loss can be quantified. Field, supra, 209 N.J. Super. at 530, 507 A.2d 1209; Fiore v. Consolidated Freightways, 270 N.J. Super. 520, 544, 637 A.2d 578 (App.Div.), certif. granted, 137 N.J. 165, 644 A.2d 613 (1994). The *112 change, which also increased Fund responsibility, was made at least in part to encourage the hiring of disabled workers by eliminating the risk of full liability for later total disability. See generally Report of the New Jersey Workmen's Compensation Study Commission, September 30, 1973, Part IV, Section IV, Returning the Injured Worker to the Job  The Second Injury Fund.
N.J.S.A. 34:15-95, the Second Injury Fund statute, now provides:
[Fund payments shall be made] to persons totally disabled, as a result of experiencing a subsequent permanent injury under conditions entitling such persons to compensation therefor, when such persons had previously been permanently and partially disabled from some other cause; provided, ... however, that no person shall be eligible to receive payments from such fund:
(a) If the disability resulting from the injury caused by the person's last compensable accident in itself and irrespective of any previous condition or disability constitutes total and permanent disability within the meaning of this Title.
(b) (Deleted by amendment.)
(c) If the disease or condition existing prior to the last compensable accident is progressive and by reason of such progression subsequent to the last compensable accident renders the person totally disabled within the meaning of this Title.
(d) If a person who is rendered permanently partially disabled by the last compensable injury subsequently becomes permanently totally disabled by reason of progressive physical deterioration or preexisting condition or disease.
Paragraphs (a), (c), and (d) exempt the Fund from liability if the subsequent injury in itself renders the employee totally disabled or if a progressive condition renders an employee totally disabled following injury at work.[1]See generally Ratsch v. Holderman, 31 N.J. 458, 475, 158 A.2d 24 (1960) (Burling, J., dissenting). Deleted paragraph (b) formerly exempted Fund liability when

*113 permanent total disability results from the aggravation, activation or acceleration, by the last compensable injury, of a pre-existing noncompensable disease or condition.
[L. 1940, c. 133.]
In sum, prior to the 1979 amendments, the Fund was only liable when two unrelated disabilities combined to cause total disability. See, e.g., Balash v. Harper, 3 N.J. 437, 442, 70 A.2d 747 (1950); Wexler v. Lambrecht Foods, 64 N.J. Super. 489, 504-05, 166 A.2d 576 (App.Div. 1960), certif. denied, 34 N.J. 326, 168 A.2d 691 (1961); Bello v. Comm'n of Dep't of Labor, 106 N.J. Super. 405, 414, 256 A.2d 63 (App.Div. 1969), rev'd on other grounds, 56 N.J. 41, 264 A.2d 222 (1970). Paragraph (b) was interpreted to preclude Fund liability for aggravation of both pre-existing non-compensable and compensable diseases or conditions. Paul v. Baltimore Upholstering Co., 66 N.J. 111, 128, 328 A.2d 610 (1974). Thus, prior to the Amendments, the employer took the employee as the employee came to the employment, subject to credit for compensation already paid (former N.J.S.A. 34:15-12(d)), and was fully liable for total disability arising from aggravation of a pre-existing disease or condition. See Belth v. Ferrante & Son, Inc., 47 N.J. 38, 45, 219 A.2d 168 (1966); Paul, supra, 66 N.J. at 128, 328 A.2d 610. Of course, where apportionment was possible, the subsequent employer was only responsible for the percentage of injury occurring during its employment. Cf. Ort v. Taylor-Wharton Co., 47 N.J. 198, 203, 219 A.2d 866 (1966).
After paragraph (b) was deleted by the 1979 amendments, one writer, a compensation judge, made the following comments on the effect of that deletion:
The Amendments will also place a greater financial burden on the Fund because conditions which were previously the sole responsibility of the employer by virtue of their aggravation will now be divided between the Fund and the employer due to the credit in section 34:15-12(d) and due to the elimination of aggravation of a preexisting condition as a basis for denial of Fund benefits.
[Fred H. Kumpf, Occupational Disease Claims Under the Workers' Compensation Reforms, 12 Seton Hall L.Rev. 470, 476 (1982).]
In addition, the Supreme Court noted in Lewicki v. New Jersey Art Foundry, 88 N.J. 75, 438 A.2d 544 (1981) that

*114 [a] significant change was made by the deletion of subsection (b) which had sheltered the Fund from liability if permanent total disability resulted from aggravation of a preexisting disability by the last compensable injury. This modification will undoubtedly result in greater exposure of the Fund to claims against it.
[Id. at 85, 438 A.2d 544 (citation omitted).]
Significantly, the Court also noted that it did not agree that "every prior disability ... must meet the rigorous literal formula of `fixed, measurable and arrested' to form the basis for Second Injury Fund liability." Id. at 86, 438 A.2d 544. The Court held that the "phrase was not intended as a dispositive test for qualification for the Second Injury Fund." Id. at 87, 438 A.2d 544. "Thus, when a compensable injury combines with a previous condition or disability resulting in total disability the Fund is liable even though the condition or disability is not static." Id.
In Zabita v. Chatham Shop Rite, Inc., 208 N.J. Super. 215, 505 A.2d 194 (App.Div. 1986), we held that "to the extent any specific pre-existing injury or condition has been aggravated, activated or accelerated by the later compensable accidental injury the employer will be liable for the disability caused by the compensable injury including any aggravation, activation or acceleration and that the Fund will then be required to assume liability for the difference between such award and the total disability." Id. at 222, 505 A.2d 194. To some extent, our holding in Zabita may detract from the Fund's purpose of encouraging employers to hire employees with existing disabilities by not holding the employer liable for total disability stemming from the consequences of a previous disability and a subsequent work-related injury. See Paul v. Baltimore Upholstering Co., supra, 66 N.J. at 129, 328 A.2d 610. However, we do not retreat from our position in Zabita because we perceive that the definable disability directly attributable to an aggravation or acceleration of a pre-existing condition is a direct effect of the compensable accident or exposure and is, therefore, the burden of the employer and not the Fund. Zabita, supra, 208 N.J. Super. at 223, 505 A.2d 194.
*115 It is clear, however, that employers can no longer be held subject to the entire risk of liability for total disability when it is established by competent evidence that there is a previous measurable functional disability. See N.J.S.A. 34:15-12(d); Field, supra, 209 N.J. Super. at 530, 507 A.2d 1209. Thus, in a total disability case the subsequent employer may only be held responsible for the direct consequence of an accident or exposure, including the extent to which it aggravates or accelerates the pre-existent condition, but excluding any separate and quantifiable previous disability. The legislative scheme requires that responsibility for such prior disability fall on the Fund if the prior disability is not assignable to another employer.
The compensation judge assessed full liability against Enoch based on the premise that Bond requires that in occupational disease cases the last employer be held liable for the total disability if it is shown that exposure during the last employment "contributed to the resultant disability by an appreciable degree or a degree substantially greater than de minimis." See Peterson v. Hermann Forwarding Co., 267 N.J. Super. 493, 504, 631 A.2d 1274 (App.Div. 1993), certif. denied, 135 N.J. 304, 639 A.2d 303 (1994). Argument with respect to employer credit under N.J.S.A. 34:15-12(d) and Fund responsibility in light of the application of that section was not presented or considered at the workers' compensation hearing.
We infer from the judge's findings that he determined that petitioner's exposure at Enoch materially contributed to his ultimate disability. The judge noted that Dr. Sollami opined that exposure at Enoch was not "a material contributory factor," but rejected this opinion as not persuasive. The finding that the Enoch exposure materially contributed to petitioner's condition, while highly controverted, is sufficiently supported by the evidence. See Close v. Kordulak Bros., 44 N.J. 589, 599, 210 A.2d 753 (1965). The judge also accepted Dr. Daum's testimony that petitioner became totally disabled only after the three days of *116 work at Enoch and that this exposure resulted in damage to petitioner's lungs.
Because assignment of fault to each previous employer was not possible, the judge did not give consideration to the clear indications in the record that petitioner's disability was capable of measurement prior to employment at Enoch. The petitioner did not have to be totally disabled in order to assess his previous disability. A determination that the petitioner's total disability was solely attributable to his exposure at Enoch cannot be sustained, either factually or legally, on the evidence presented. Close, supra, 44 N.J. at 599, 210 A.2d 753. All, including petitioner's expert, Dr. Daum, agreed that petitioner was severely disabled prior to working for Enoch. Enoch appears only to be liable for a small percentage of petitioner's total disability. We are satisfied that the record is sufficiently developed to permit such an assessment. That Dr. Daum stated that her estimate of disability might not rise to the level of medical probability is not dispositive.
The fact that fault cannot be assigned against a petitioner's previous employers does not prevent an employee from receiving full compensation. The Fund is responsible under appropriate circumstances for the portion of a petitioner's prior condition that contributed to the total disability. N.J.S.A. 34:15-95. Granting an employer credit for previous loss of function under N.J.S.A. 34:15-12(d), while allowing the employee to recover from the Fund for unassignable previous permanent disability, allows full compensation to the employee while removing the disincentive to hiring workers with pre-existing conditions. The risk of total disability as a result of successive, unassignable injury is placed on all employers through the Fund.
We agree with the judge that responsibility in the present case cannot be assigned to any specific previous employer; a consequence caused to some extent by the fact that petitioner only filed and pursued a claim against the last employer, Enoch. In any event, it is not possible to determine the disability, if any, *117 apportionable even as to Proctor because of the absence of testimony regarding the specifics of that employment. The judge's finding that responsibility cannot be quantified with respect to previous employers constitutes a sufficient prerequisite for Fund liability here, because the Enoch exposure combined with the prior disability to raise petitioner's pulmonary disability to the level that he became totally disabled. We do not find any need to question the judge's failure to articulate the relationship, if any, of petitioner's other pre-existing disabilities to his total disability.
The Fund will in any event have an opportunity to be heard in further proceedings before the judge of compensation. The workers' compensation rules provide that if settlement between the employee, employers, and the Fund cannot be effectuated, a trial should proceed to determine the "probable responsible respondent." N.J.A.C. 12:235-7.1. Thereafter, a hearing will be held to determine the liability of the Second Injury Fund. N.J.A.C. 12:235-7.2. An issue may arise as to the validity of a judgment ordering retroactive payments by the Fund. This is because of the limited term of the payments to be assessed against Enoch and the time that has now passed because of the protracted proceedings encountered in this matter. We do not perceive that petitioner should be denied compensation for any retroactively due payments from the Fund, except to the extent that N.J.S.A. 34:15-95 proscribes payments "for any period prior to the date of filing of application therefore." Id. Any Fund policy dictating a prohibition beyond that period would appear to conflict with the statute and also detract from the procedures established by N.J.A.C. 12:235-7.2.
We reverse and remand for assessment of the disability directly attributable to the employment of petitioner at Enoch and for a determination of Fund responsibility.
NOTES
[1] Prior to amendment, paragraph (c) read: "If the disease or condition existing prior to the last compensable accident is not aggravated or accelerated but is in itself progressive and by reason of such progression subsequent to the last compensable accident renders him totally disabled within the meaning of this Title." L. 1940, c. 133.