721 A.2d 724 (1998)
Michael LEVAS, Petitioner-Respondent,
v.
MIDWAY SHEET METAL, Respondent-Appellant, and
D & M Sheet Metal, Middlesex Sheet Metal Co., Elmsford/Independent Joint Venture # IV, Allied Ventilation, Inc., Raritan Valley Sheet Metal, Inc., Folander Sheet Metal Co. and the Second Injury Fund, Respondents-Respondents, and
Bonland Industries, Inc. and Hayden Schweitzer Corp., Respondents.
Superior Court of New Jersey, Appellate Division.
Argued October 21, 1998.
Decided November 17, 1998.
*725 Eric S. Lentz for respondent-appellant Midway Sheet Metal (Mr. Lentz, on the brief).
Mark S. Garver for respondent-respondent D & M Sheet Metal (Charles P. Hopkins, Shrewsbury, attorney; Adrienne C. Reim, on the brief).
Francis T. Giuliano, Ramsey, for respondents-respondents Middlesex Sheet Metal, Elmsford/Independent Joint Venture IV, Raritan Valley Sheet Metal and Folander Sheet Metal (Mr. Guiliano attorney; David P. Kendall, on the brief).
David L. Schlosser, Roseland, for respondent-respondent Middlesex Sheet Metal (Robert G. Bressler, attorney; Mr. Schlosser, on the letter brief).
Steven J. Currenti for respondent-respondent Allied Ventilation, Inc. (Frieland & DeSanto, attorneys; Mr. Currenti, on the brief).
Linda Schober, Deputy Attorney General, for respondent-respondent Second Injury Fund (Peter Verniero, Attorney General of New Jersey, attorney; Mary C. Jacobson, Assistant Attorney General, of counsel; Ms. Schober, on the brief).
Wysoker, Glassner & Weingartner, New Brunswick, for petitioner-respondent Michael Levas (Allan L. Lockspeiser, on the brief).
Before Judges BAIME, CONLEY and A.A. RODRIGUEZ.
The opinion of the court was delivered by CONLEY, J.A.D.
Michael Levas, the workers' compensation petitioner in the present matter, was a sheet metal worker from 1957 to 1991 during which, the competent evidence reveals, he developed an occupational pulmonary condition from which he was found by the workers' compensation judge to be totally disabled. During this time period, particularly from the early months of 1990 to February of 1991, petitioner was exposed to a significant amount of pulmonary irritants while working at a renovation project at a Ford Motor Company plant in Edison under the employment of a number of different employers, including respondents D & M Sheet Metal, Elmsford/Independent Joint Venture # IV, Allied Ventilation, Inc., Raritan Valley Sheet Metal, Inc. and Folander Sheet Metal Co. Respondent Middlesex Sheet Metal Co. was his employer prior to the Ford plant employments. Appellant, Midway Sheet Metal, was his last employer and for whom he worked approximately one week. Applying Bond v. Rose Ribbon & Carbon Mfg. Co., 42 N.J. 308, 200 A.2d 322 (1964), the compensation judge imposed the entire responsibility for petitioner's occupational pulmonary disability upon Midway. Midway appeals contending:
POINT I. THE PETITIONER HAS FAILED TO MEET HIS BURDEN OF PROOF.
POINT II. THE DECISION OF THE JUDGE OF WORKER'S COMPENSATION IS WITHOUT SUFFICIENT SPECIFICITY AND SUFFICIENT FINDINGS OF FACT.
POINT III. ALLOCATION OF DISABILITY.
*726 POINT IV. ASSUMING THE PETITIONER IS TOTALLY DISABLED THE COURT SHOULD HAVE APPORTIONED LIABILITY TO THE SECOND INJURY FUND.
We have carefully considered these contentions in light of the entire record and applicable law. Points I and II are without merit and we treat them only briefly. Close v. Kordulak Bros., 44 N.J. 589, 599, 210 A.2d 753 (1965). We agree, however, that points III and IV have merit and require a remand.

I
Before addressing these contentions, we set forth the facts. At the time of trial petitioner was fifty-seven years of age and had been employed as a sheet metal worker for thirty-eight years as a union laborer working out of Sheet Metal Local 20. As a result of his membership in the union, petitioner worked for numerous different employers over the years, including the employers involved in this appeal.
As described by petitioner the work he performed involved going into plants, both old and new, ripping out old duct work in the ceilings and installing new duct work if necessary. He also worked with old and new pipes and various types of insulation, drilling holes in concrete walls and floors and welding metal. He was employed by Middlesex Sheet Metal initially for five to six consecutive years and then intermittently for a long period of time between 1961 and 1980. While working for Middlesex, petitioner fabricated and cut metal and also worked in a shop area with transite pipe, which contained asbestos.[1] He was exposed to a great deal of dust. Petitioner was also sent out by Middlesex to various jobs at factories and plants removing and installing duct work, working on exhaust systems and roofs, and performing other work indicative of the sheet metal worker profession. Petitioner claimed that each of the job sites Middlesex sent him to exposed him to dust and fumes. Despite these various exposures during his employment with Middlesex, there is no medical evidence that petitioner's subsequent occupational pulmonary condition manifested itself while working for Middlesex or that he required medical attention for pulmonary problems during that employment.
Union records placed in evidence during the trial indicate that petitioner worked next for D & M Sheet Metal at the end of December 1989 for varying periods of time through March 31, 1990. Sometime in early 1990, D & M sent him to the Ford plant in Edison, although the president of D & M testified at trial that his company was never contracted to work at the Ford plant. Petitioner described the conditions at the Ford plant as follows:
Q. Now, during the time of D & M in 1990 in the Ford plant, what were the working conditions like?
A. Worse I've ever seen as far as being on a construction site for over 30 years. It's the worst working conditions I've ever endured.
Q. I need you to be more specific.
A. I mean, there was poor lighting. When there was lighting you could hardly see. The dust was so thick. The fumes were so thick you could hardly breathe.
Q. Can you tell us what the dust and fumes were coming from?
A. Well, we were using torches, burning torches. We were actually melting the steel to break them up into little pieces. They were too heavy. We had to make them little pieces so we can personally handle them so we can throw them on trucks. We were using bulldozers to pick up the pieces.
Q. When you were using torches, what would happen?
A. It would melt, the paint would melt that was on the pieces of steel, oil and grease that was on the pieces of steel would melt. *727 ....
A. It would make fumes. It would smoke.
....
Q. Now, you mentioned dust. Where would that be coming from?
A. The dust came from everything. It was an accumulation of dust from laying on the machinery for several years. Who knows, it was dust in the machinery as it was being used. The concrete when we busted it up, many times we had to break up the concrete to get the steel out of. That would powder, make dust.
Q. Where did you see the [dust]?
A. In the air, almost everything that we touched there was some sort of a dust on it.
....
A. Sometimes we went through two to three pairs of dust masks we would throw away. You couldn't use them anymore. They were so thick with black dust.
....
A. [My clothing was] [f]ilthy. I had to throw it away. Many times my clothes was thrown away. My working gloves, my dust mask had to be thrown away.
During the first few months of working at the Ford plant, petitioner developed a bad cough and shortness of breath. On February 22, 1990, petitioner was hospitalized at St. Peters Medical Center for difficulty breathing. There, petitioner was diagnosed with bronchitis. He was then referred to the care of his family physician, Dr. Eugene Pirog, who began treating petitioner for his breathing problems. Following the initial diagnosis of a breathing problem, petitioner temporarily stopped working. He denied having any problems with his breathing prior to his various jobs at the Ford plant.
Petitioner's employment with D & M ended in March of 1990, but thereafter he returned to work at the Ford plant from approximately the end of May 1990 through the end of December 1990 for various other employers who were involved in the renovation project. There is some confusion in the record as to what dates petitioner worked for the different employers. According to the union records which are in evidence, petitioner worked for Folander Sheet Metal in May 1990. Then, he worked for Elmsford Independent Joint Venture IV in May 1990,[2] July 1990 and August of 1990. Petitioner also worked for Bonland Industries, Inc. in June of 1990, and for Allied Ventilation, Inc. in July and August of 1990. Finally, petitioner worked for Hayden Schweitzer in November and December of 1990. Petitioner performed duties for these companies consistent with his general description of a sheet metal worker. All of the various employments occurring at the Ford Motor plant had the same pulmonary irritant conditions which were "the worse [petitioner] had ever seen." Various other employees at the Ford plant attested to the poor conditions described by petitioner.
During this period, petitioner continued treatment with Dr. Pirog for his bronchitis and breathing problems up to about August of 1990. Shortly thereafter, in or about October or November of 1990, petitioner began treating with a Dr. Blum for "allergies, sinusitis, [and nasal] polyps for which [he] had to go every week and get four needles."
Following these various employments which ran through the end of December 1990,[3] petitioner returned to work at the Ford plant in January of 1991 for Raritan Valley Sheet Metal, Inc. In that employment, he worked on the roof of the plant, where the conditions were better than inside the plant, although he was still exposed to some dust and fumes.
During this time petitioner continued treatment with Dr. Blum. In addition, and while employed by Raritan, petitioner had a second hospital visit at St. Peters on January 16, 1991 because of coughing and shortness *728 of breath. The diagnosis impression was "broncospasm and shortness of breath." A January 16, 1991 chest x-ray revealed "poor inspiration, pleural thickening, bibasal infiltrates and cardio-megaly." On February 4, 1991, petitioner began treatment with another doctor, who at that time diagnosed "obstructive lung disease by history," among other conditions. On February 8, 1991, petitioner, while still employed by Raritan, was again hospitalized and treated for "obstructive lung disease." Petitioner's employment with Raritan ended on February 15, 1991.
Petitioner returned to work for one last time. His employer was Midway. He worked from March 4, 1991 to approximately March 11, 1991 on an office project removing old duct work and installing new duct work. Petitioner described the work as involving a lot of cutting through various duct work, pipe and insulation, exposing him to dust and dirt. After only one week working for Midway, petitioner stopped working altogether because of his breathing problems. On March 18, 1991, petitioner began treating with Dr. Andrew Freedman for his pulmonary condition, who opined that petitioner's condition first manifested itself in February 1990.
From the date of his last employment in 1991 to the present, petitioner has been hospitalized on numerous occasions and treated for breathing problems. Altogether, petitioner was hospitalized in March of 1991 for nasal polyps and bronchitis; in June of 1992 for bronchitis; in January of 1993 for wheezing and bronchitis; in July and August of 1993 for chronic obstructive pulmonary disease and asthma; in August and September of 1994 for bronchitis; and finally again in September of 1994 for chronic obstructive pulmonary disease and bronchitis. He continues to be treated by Dr. Freedman, and he has serious difficulty breathing, a persistent coughing and a recurrent sense of suffocating.
Both of petitioner's medical witnesses, Dr. Freedman, his treating physician, and Dr. Hermele, his pulmonary expert, opined that petitioner was totally disabled from his pulmonary condition alone, characterized by Dr. Freedman as "chronic airways disease," and that that condition was caused by petitioner's pulmonary irritant exposure. In particular, Dr. Freedman was asked by counsel on direct whether petitioner's work history, as described in a lengthy hypothetical posed to the doctor, could have contributed to the development of petitioner's current condition. Dr. Freedman testified that "exposure to this volume of irritant airway material over this number of years would certainly bring about cumulative chronic inflammation of the airways and bring about his current condition." The doctor explained that excessive exposure to dust and material that can be inhaled results in that material depositing in the airways causing inflammation and the production of a large amount of mucous, which in turn results in chronic irritation of the airways. Dr. Freedman agreed that petitioner's underlying pulmonary condition became manifest in February 1990 and that the medication he prescribed for petitioner in 1991, and currently, was the same as prescribed as of February 1990.
Dr. Hermele also opined that petitioner's pulmonary condition became manifest in February 1990. At that point he thought petitioner's pulmonary disability was 50% of total. He also thought that the condition had worsened during the time period of the Ford plant exposure, and thereafter. Initially, he estimated petitioner's disability at 65% in November of 1992. He later increased that assessment to 75% in October of 1993, and finally to 100% in 1996.
To be sure, respondents produced their own medical experts who opined that petitioner had no obstructive airway disease. As to petitioner's employment with appellant Midway, its doctor offered the opinion that that employment had no impact upon his condition since it was "very brief."
The compensation judge found that petitioner was permanently totally disabled, that petitioner's employment as a sheet metal worker contributed to a material degree to his condition, but that Midway, as his last employer, was responsible for the full amount of petitioner's disability pursuant to Bond v. Rose Ribbon & Carbon Mfg. Co., 42 N.J. 308, 200 A.2d 322 (1964) (Bond). As to the latter, the judge said:

*729 I'm satisfied that in [petitioner's] case, that his work incapacity did not begin until March 1991 after he last worked in Midway or with Midway Sheet Metal. Admittedly, his period of exposure was short. Admittedly, there was no testimony that he was exposed to air as vile, as vile and filthy, as that to which he was exposed at Ford Motor Company.
On the other hand, he was not working in an ice cream store. He was not working in a mall selling books or something like that. He was working in an enclosed area. I heard testimony from a witness who said that there was no dust or metal being cut and no fumes from welding there. That testimony stretches my imagination
I'm satisfied that there were pulmonary irritants there. They well could have been, and I think they were the straw that broke the camel's back.
The judge concluded, therefore, that petitioner "became totally disabled as of the last date of employment, and I base that on the finding of Dr. Freedman's testimony." As a result, the judge thought that Bond required Midway to shoulder the full burden of petitioner's disability.

II
As the recitation of the above evidence should make clear, the compensation judge's conclusion of total disability from an occupational pulmonary condition caused to a material degree by petitioner's employment exposure to dust, fumes and other pulmonary irritants is amply supported by the evidence and the judge's assessment of the credibility of the various witnesses. We cannot say his findings and conclusions in this respect are "`manifestly unsupported by or inconsistent with competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Dietrich v. Toms River Bd. of Educ., 294 N.J.Super. 252, 260-61, 683 A.2d 212 (App.Div.1996) (quoting Perez v. Monmouth Cable Vision, 278 N.J.Super. 275, 282, 650 A.2d 1025 (App.Div.1994)), certif. denied, 148 N.J. 459, 690 A.2d 606 (1997). See Kiczula v. American National Can Co., 310 N.J.Super. 293, 708 A.2d 742 (App.Div.1998). We do note, however, that, given his determination that Bond required Midway to be entirely responsible, the judge did not consider whether all or only some of petitioner's various employers were material contributors to his pulmonary disability. Given our conclusion that Bond does not apply here, such a determination must be made on remand.
We address the Bond issue. In Bond, the Court considered the problem of assessing liability for an employee's occupational disease where the inception of that disease cannot be accurately pin-pointed and the employee worked for successive employers or was covered by successive insurance carriers. In doing so, the Court said:
Where, as here, an employee is exposed to work conditions which activate or cause a progressive occupational disease, and the existence of such disease remains undisclosed and unknown over a period of time, it is impossible upon ultimate revelation of its existence by medical examination, work incapacity, or manifest loss of physical function, to pinpoint in retrospect, the triggering date of such activation or inception. It is also impossible to reconstruct the daily rate of progress of the disease from its genesis to discovery through one of the afore-mentioned means, where such employee continues to be exposed to work conditions which aggravate the existing disease in unascertainable stages. It follows that where the employment under such work conditions was under the aegis of successive employers or insurance carriers, from initial infection or activation to discovery or manifestation, it is impossible to accurately determine the inception and the rate of progress of the disease during such respective periods of employment or insurance coverage. Therefore, any apportionment of compensation liability between the successive employments or insurance coverages, must of necessity be speculative and arbitrary. To avoid the morass into which litigation would be pitched were apportionment required, and to eliminate the recognized unsatisfactory nature of any such attempted ascertainment, we conceive that the most workable rule and the most consistent with the philosophy and public policy of the Worker's *730 Compensation Act is to hold liable that employer or carrier during whose employment or coverage the disease was disclosed as above noted, i.e., by medical examination, work incapacity, or manifest loss of physical function. Although this test is admittedly arbitrary and may on occasion cause some apparently unfair results, over the years it should result in an equitable balancing of liability. Under the circumstances we conceive it to be the fairest and most workable thesis.

[42 N.J. at 311, 200 A.2d 322 (emphasis added).]
The Supreme Court clarified Bond in Giagnacovo v. Beggs Bros., 64 N.J. 32, 37-38, 311 A.2d 745 (1973). There the Court held that two of the stated criteria for manifestation of an occupational disease under Bond, i.e., medical examination and manifest loss of physical function, "represent in substance two methods of revelation of a specific degree of physiological pathologyone which is fixed, arrested and definitely measurable." Id. at 38, 311 A.2d 745. And see Akef v. BASF Corp., 140 N.J. 408, 415, 658 A.2d 1252 (1995) ("[w]hen there is evidence that a condition underlying a disability was obvious, diagnosable and capable of measurement, compensation for the resultant disability should be apportioned to or among those employers ... to cover the periods of prior employments during which the underlying condition was discoverable and measurable." (emphasis added)).
We think it fairly evident here that both of petitioner's medical witnesses, whose opinions were essentially accepted by the compensation judge, considered petitioner's occupational pulmonary condition, though of long standing duration, to have become manifest, diagnosable and capable of measurement as of February 1990. Indeed, Dr. Hermele measured the disability as of that time as 50% partial total. And that was the rub, in the judge's view. We discern from both his oral decision and his November 17, 1997 supplemental written decision, that he believed that manifestation of a partial disability, progressive in nature, is not legally sufficient to preclude the application of Bond where the petitioner ultimately becomes totally disabled. We disagree. The prior condition need not constitute total and permanent disability, it need only be "fixed, arrested and definitely measurable" or "obvious, diagnosable and capable of measurement." Gulick v. H.M. Enoch, Inc., 280 N.J.Super. 96, 111, 654 A.2d 987 (App.Div. 1995) ("[i]t is clear ... that employers can no longer be held subject to the entire risk of liability for total disability when it is established by competent evidence that there is a previous measurable functional [which may not then be total] disability." Id. at 115, 654 A.2d 987).
In Gulick, supra, 280 N.J.Super. 96, 654 A.2d 987, for instance, we found that the claimant's condition, albeit not entirely total, was obvious and measurable prior to working for his last employer, which had been saddled by the compensation judge with liability for his disability. The claimant worked for Enoch, Inc. for three days in November of 1987 before stopping work due to his chronic pulmonary problems. The claimant had been exposed to dirt, dust and fumes during his work history from 1950 to 1987. The claimant's pulmonary condition first came to light during a visit with a pulmonary specialist on November 2, 1987, shortly before starting work for Enoch. That specialist, after reviewing x-rays and pulmonary function studies, concluded that the claimant had an advanced chronic obstructive pulmonary disease. We, therefore, found that the claimant's condition had been manifested and capable of measurement, albeit not total, prior to his last employment and that the last employer, Enoch, could not be held fully liable. Id. at 110-11, 654 A.2d 987. Referring to N.J.S.A. 34:15-12(d),[4] we said "[w]e *731 must honor the legislative mandate that when a previous loss of function is established by competent evidence, whether compensable or not, the subsequent employer is only liable for that portion of the disability arising out of employment with that employer." Id. at 111, 654 A.2d 987.
Simply put, it is evident that petitioner's occupational condition manifested itself, both medically and functionally, prior to his Midway employment and, most probably, as early as the February 1990 hospitalization and commencement of pulmonary treatment thereafter. The compensation judge was simply wrong in ignoring this prior manifestation because the condition was not then total.
We are, therefore, convinced the compensation judge here misapplied Bond in determining Midway was totally responsible for petitioner's occupational pulmonary disability and that the matter must be remanded for an allocation determination. We recognize, moreover, that a necessary prerequisite to imposition of liability on successive employers requires actual causation, or contribution to a material degree, to the petitioner's condition by the work exposure during such employment. Vastino v. MAN-Roland, Inc., 299 N.J.Super. 628, 631, 691 A.2d 873 (App. Div.), certif. denied, 151 N.J. 464, 700 A.2d 876 (1997). Such a causative relationship "must be established to a degree substantially greater than de minimis." Ibid. See Fiore v. Consolidated Freightways, 140 N.J. 452, 469, 659 A.2d 436 (1995); Peterson v. Hermann Forwarding Co., 267 N.J.Super. 493, 504, 631 A.2d 1274 (App.Div.1993); N.J.S.A. 34:15-31. As we have previously said, the compensation judge did not decide whether the various successive employments contributed to a material degree to petitioner's pulmonary condition because, we presume, of the misapplication of Bond. And, as to Midway itself, all he said was that "it was the straw that broke the camel's back." We are not sure what the basis for that conclusion is and whether that equates to more than a de minimis impact. On remand for allocation, therefore, that causation analysis should be performed. Only those employers whose employment contributed to a degree "substantially greater than de minimis" should be considered for allocation of their respective share of petitioner's total disability. Because there is no suggestion here that petitioner's pulmonary condition became manifest during the Middlesex employment, however, the dismissal of the claim petition against it is affirmed.

III
As to the Second Injury Fund liability, N.J.S.A. 34:15-95 provides:
[Fund payments] shall be made to persons totally disabled, as a result of experiencing a subsequent permanent injury under conditions entitling such persons to compensation therefor, when such person had previously been permanently and partially disabled from some other cause; provided... however, that no person shall be eligible to receive payments from the Second Injury Fund:
(a) If the disability resulting from the injury caused by the person's last compensable accident in itself and irrespective of any previous condition or disability constitutes total and permanent disability within the meaning of this Title.
(b) (Deleted by amendment.)
(c) If the disease or condition existing prior to the last compensable accident is progressive and by reason of such progression subsequent to the last compensable accident renders the person totally disabled within the meaning of this Title.
(d) If a person who is rendered permanently partially disabled by the last compensable injury subsequently becomes permanently totally disabled by reason of progressive physical deterioration or preexisting condition or disease.
The Supreme Court in Lewicki v. New Jersey Art Foundry, 88 N.J. 75, 85, 438 A.2d 544 (1981), noted that "[a] significant change was made by the deletion of subsection (b) which had sheltered the Fund from liability if permanent total disability resulted from aggravation of a preexisting disability by the *732 last compensable injury. This modification will undoubtedly result in greater exposure of the Fund to claims against it."
We initially observe that although petitioner has had conditions other than his pulmonary disability, such as allergies, nasal polyps, hepatitis and a lacerated ear, the compensation judge found that he was totally disabled, for compensation purposes, as a result of his occupational pulmonary condition alone. As we have said, there is sufficient credible evidence to support this conclusion. Fund liability, therefore, cannot arise from these other conditions.
As to Fund liability that might be assignable to part of petitioner's pulmonary condition, our decision in Gulick, supra, 280 N.J.Super. 96, 654 A.2d 987, is helpful. As we have previously discussed, in Gulick the petitioner had filed a compensation petition for his pulmonary disease, which resulted from years of exposure to pulmonary irritants while working for various employers, against his last employer, Enoch, Inc., for whom he had worked only three days and we determined that the Judge of Compensation had erroneously imposed liability solely on this last employer. As to Fund liability, we said:
The fact that fault cannot be assigned against a petitioner's previous employers does not prevent an employee from receiving full compensation. The Fund is responsible under appropriate circumstances for the portion of a petitioner's prior condition that contributed to the total disability.... The risk of total disability as a result of successive, unassignable injury is placed on all employers through the Fund.

We agree with the judge that responsibility in the present case cannot be assigned to any specific previous employer.... The judge's finding that responsibility cannot be quantified with respect to previous employers constitutes a sufficient prerequisite for Fund liability here, because the Enoch exposure combined [to a material degree] with the prior disability to raise petitioner's pulmonary disability to the level that he became totally disabled.

[Id. at 116-17, 654 A.2d 987 (emphasis added).]
Because responsibility for a large part of petitioner's disability "could not be assigned to any specific previous employer," our remand to the compensation judge included imposition of Fund liability. Id. at 117, 654 A.2d 987.
Therefore, for the Fund to be liable here, it would have to be determined that petitioner's disability could not be fully apportioned among his various Ford plant employers. The compensation judge did not address this issue. Possibly, Fund liability might be assignable to the Middlesex exposure. In any event, since Fund liability on that basis was not considered below, we are reluctant to resolve that issue here.

IV
We therefore affirm the dismissal of the petition against Middlesex. We also affirm the finding of total disability from an occupational pulmonary condition. In all other respects the matter is remanded to the compensation judge for further proceedings consistent with this opinion. We leave it to the discretion of the compensation judge as to whether further evidence should be required of the various remaining respondents to properly assess their causative role in petitioner's total disability and their respective allocation of responsibility. We do not retain jurisdiction.
NOTES
[1] There was considerable testimony regarding petitioner's exposure to asbestos at the various job sites. However, petitioner's treating physician, Dr. Freedman, testified that petitioner did not have asbestosis and the claim petitions filed in the present matter involve only an "internal pulmonary disability." Petitioner is, however, currently a member of an asbestos exposure class action.
[2] In June of 1990, while working for Elmsford, petitioner was hit in the head by a steel beam. The blow partially ripped off his ear. He was treated, suffered headaches and claimed that he developed TMJ problems and ringing in his ears.
[3] We are told that petitioner asserted on a social security disability application that he was unable to work as of November 1990, although he made three attempts thereafter to return to work.
[4] N.J.S.A. 34:15-12(d) provides:

If previous loss of function to the body, head, a member or an organ is established by competent evidence, and subsequently an injury or occupational disease arising out of and in the course of an employment occurs to that part of the body, head, member or organ, where there was a previous loss of function, then and in such case, the employer or the employer's insurance carrier at the time of the subsequent injury or occupational disease shall not be liable for any such loss and credit shall be given the employer or the employer's insurance carrier for the previous loss of function and the burden of proof in such matters shall rest on the employer.