been submitted to the jury. In light of our decision herein, we need not address and resolve whether the trial judge erred in presenting the malicious prosecution claim to the jury.

Reversed and remanded for entry of judgment in favor of defendant.

766 A.2d 1212

MICHAEL LEVAS, PETITIONER–RESPONDENT, v. MIDWAY SHEET METAL, D & M SHEET METAL, ALLIED VENTILATION, INC., HADEN SCHWEITZER CORPORATION, AND THE SECOND INJURY FUND, RESPONDENTS–RESPONDENTS, AND ELMSFORD/INDEPENDENT JOINT VENTURE # IV, RARITAN VALLEY SHEET METAL, INC., FOLANDER SHEET METAL COMPANY, AND BONLAND INDUSTRIES, INC., RESPONDENTS–APPELLANTS, AND MIDDLESEX SHEET METAL COMPANY, RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued February 6, 2001—Decided February 23, 2001.

342

Before Judges SKILLMAN, CONLEY and LESEMANN.

*David P. Kendall* argued the cause for respondents-appellants Elmsford/Independent Joint Venture # IV, Raritan Valley Sheet Metal, Inc., Folander Sheet Metal Company, and Bonland Industries, Inc. (*Francis T. Giuliano*, of counsel; *Mr. Kendall*, on the brief).

*Wysoker, Glassner, Weingartner, Gonzalez & Lockspeiser*, attorneys for petitioner-respondent Michael Levas, have not filed a brief.

*Golden, Rothschild, Spagnola, Lundell & Levitt*, attorneys for respondent-respondent Haden Schweitzer Corporation, have not filed a brief.

*Passman, Dougherty & Zirulnik*, attorneys for respondent-respondent Midway Sheet Metal, have not filed a brief.

*Robert W. Frieland*, attorney for respondent-respondent Allied Ventilation, has not filed a brief.

*Charles P. Hopkins, II*, attorney for respondent–respondent D & M Sheet Metal, has not filed a brief.

*John J. Farmer, Jr.*, Attorney General, attorney for respondent Second Injury Fund (*Linda A. Lockard–Phillips*, Deputy Attorney General, filed a letter brief but did not argue).

The opinion of the court was delivered by

CONLEY, J.A.D.

This appeal [1] returns to us following our remand to the workers' compensation judge on the issues of whether petitioner's respective employments with various successive employers from early 1990 to February 1991 (the Ford plant employers), during which he was exposed to pulmonary irritants, contributed in a degree substantially greater than *de minimis* to his permanent total pulmonary disability and whether that contribution could be apportioned among those successive employers whose employments did so contribute. *Levas v. Midway Sheet Metal,* 317 *N.J.Super.* 160, 174, 176, 721 *A.2d* 724 (App.Div.1998) (*Levas I*). In so remanding, we found sufficient credible evidence to support the compensation judge's conclusion that petitioner was permanently totally disabled from his occupational exposure to various pulmonary irritants. *Id.* at 170, 721 *A.2d* 724. Although respondents-appellants Elmsford/Independent Joint Venture # 4, Raritan Valley Sheet Metal, Inc., Folander Sheet Metal Co., Inc., and Bonland Industries, Inc., seek to relitigate that issue, we decline to do so.

On remand, the compensation judge found that each of the respective employments did contribute to a material degree to petitioner's overall disability. In this respect, the judge said in his oral decision of March 29, 1999, supplementing his written January 4, 1999, decision:

> [T]his was a series of exacerbations and aggravations of the disease by subsequent employment until the petitioner finally became total. This was not a matter of an initial exposures at D & M producing the illness and then the illness progressing on its own.... I'm satisfied from Dr. Freedman's testimony and Mr. Levas' testimony that he was exposed each day to a significant amount of pulmonary toxins to the extent that they aggravated his condition which manifested itself with D & M and when he last worked at Midway, the condition evolved into a permanent total situation.

---

[1] There are two other related appeals, Docket No. A–4681–98T5, filed by Allied Ventilation, Inc., and Docket No. A–4451–98T5, filed by Haden Schweitzer Corporation. Although neither of these parties has filed briefs in this appeal, they did file briefs in their own respective appeals. Our opinion in this appeal renders both related appeals moot. Opinions in all three appeals are being simultaneously filed.

We are satisfied that the record provides ample support for this conclusion and, therefore, reject point I of appellants' brief.[2]

Also on remand, the judge apportioned the responsibility for petitioner's permanent total disability award equally against each of the Ford plant employers. He did so based entirely upon the notion of "equity." It is this aspect of the judge's decision that concerns us. Before addressing it substantively, we note some troubling procedural aspects of this appeal and the two related appeals. The allocation issue, the main issue that should concern the respondents, is not raised by respondents in this appeal. While addressed by Allied Ventilation in its separate appeal, it is responded to only by the four respondents-appellants here and respondent D & M Sheet Metal. The primary employer who benefits from the judge's allocation and who might be hurt most by a reversal is Midway Sheet Metal. Midway has not participated at all in this appeal, although it did participate in the remand "proceeding."

As for that "proceeding," it consisted of no more than oral argument, attended only by counsel for Allied Ventilation and Midway Sheet Metal, along with counsel for Local 27 Health and Welfare Fund Sheet Metal Workers which had a lien on petitioner's award. At this "proceeding," counsel for Midway argued in part:

On behalf of Midway, the employment with Midway was a brief, unsuccessful last-ditch effort by the petitioner to try to eke out a living. He already put in papers for Social Security and had represented to the Social Security Administration that his disability commenced approximately November of 1990 before trying to work at Midway.

*The petitioner's own proofs establish a manifestation and disability in 1990*, early 1990, so that this case is, as the Appellate Division has already said, is really not a *Bond* case.

---

[2] Point II of this brief focuses solely upon respondent Bonland Industries against whom an award was entered on remand but who claims lack of jurisdiction as no appeal was taken from the original order dismissing the claim petition against it. Our resolution of this appeal renders this point moot. Therefore, we do not address it.

There is more than enough evidence to find one of the employers in this case, D & M, responsible for the bulk of the petitioner's disability and I don't want to bandy about numbers, but I think Dr. Hermele himself proffered a number, which I believe was 50% partial total. That's a good starting point, I believe.

There is subsequent employment with several employers [at the Ford plant]. . . .

. . . .

. . . I believe the petitioner's description of the work environment at the Ford demolition project speaks for itself. His testimony was corroborated by several co-employees, and I found it very impressive that people with 40 plus years of experience in the sheet metal trade all testified that the Ford demolition project was one of the worst, if not the worst, employment they have encounter[ed]. That's astounding that several people with so many years of experience would testify to the same thing, so I find or I think that the Court should find that the workplace environment at the Ford demolition project with the various employers during that time period should be held responsible.

If the Court finds that D & M is responsible for something less than total disability, then I think the Court has ample evidence to support a finding that the employers involved in the Ford demolition project have an exposure so great that it did, in a material degree, contribute to the worsening of this man's lung condition.

I also feel that *there are records of medical treatment throughout that time period in 1990 and again in early 1991 [during employment with Raritan Valley Sheet Metal] before the petitioner ever worked for Midway, so that there are medical manifestations of disability for that same time period,* so I think under the case law, and I won't get into case names because they've been mentioned more than enough by this Appellate Division, by this court, by petitioner's attorney and respondents' attorneys, we know the cases, I think, but I do think that this Court should find that responsibility lies with the employers I have just mentioned.

[Emphasis added.]

Midway, then, pointed the finger at D & M and Raritan Valley Sheet Metal. Neither they nor any other respondent made any effort to assist the judge, by way of additional medical testimony or otherwise, in an appropriate method of allocating the responsibility of petitioner's total disability. We find this somewhat troublesome as allocation of responsibility would seem to be the employers' burden where, as here, petitioner demonstrates a compensable disability substantially the product of respondent employers' exposure. We suppose respondents here were not concerned with that burden because their primary position was that petitioner's disability was not work related at all and that any contribution to it by the occupational exposure was *de minimis.* But, it should have been evident from our prior opinion that that

battle was lost and that the focus was upon allocation of responsibility. Given respondents', at best, lackluster participation on the remand, we might simply saddle each with a *pro rata* share, as did the judge.

We do not believe, however, such a result is legally justified, given the existing case law in this State. We address the judge's equal allocation in some depth, despite respondents' lack of assistance. In doing so, we repeat much of what we said in our prior opinion. Because we conclude that the matter must again be remanded, we attempt to provide some better guidance for the compensation judge than we did previously.

There is no question that prior to commencing employment with the Ford plant employers petitioner had a latent pulmonary condition. Critical to our resolution of this appeal, we repeat here what we recited in *Levas I* as to the progression of this condition during the Ford plant employments:

> During the first few months of working at the Ford plant, petitioner developed a bad cough and shortness of breath. On February 22, 1990, petitioner was hospitalized at St. Peters Medical Center for difficulty breathing. There, petitioner was diagnosed with bronchitis. He was then referred to the care of his family physician, Dr. Eugene Pirog, who began treating petitioner for his breathing problems. Following the initial diagnosis of a breathing problem, petitioner temporarily stopped working. He denied having any problems with his breathing prior to his various jobs at the Ford plant.
>
> [*Levas I,* 317 *N.J.Super.* at 166, 721 *A.*2d 724.]

We add here that it is clear from the record that at this point in time petitioner's prior latent condition became manifest, arrested and fixed to some degree. Respondent D & M was petitioner's employer at this time. That employment ended in March 1990.

Petitioner resumed employment at the Ford plant from May 1990 to the end of December 1990. As we said in our prior opinion:

> According to the union records which are in evidence, petitioner worked for Folander Sheet Metal in May 1990. Then, he worked for Elmsford/Independent Joint Venture IV in May 1990, July 1990 and August of 1990. Petitioner also worked for Bonland Industries, Inc. in June 1990, and for Allied Ventilation, Inc. in July and August of 1990. Finally, petitioner worked for Hayden Schweitzer in November and December of 1990.... All of the various employment occurring at

the Ford Motor plant had the same pulmonary irritant conditions which were "the worse [petitioner] had ever seen."

[*Id.* at 166–67, 721 *A*.2d 724.]

As to medical treatment received by petitioner during these employments, we noted:

During this period, petitioner continued treatment with Dr. Pirog for his bronchitis and breathing problems up to about August of 1990. Shortly thereafter, in or about October or November of 1990, petitioner began treating with a Dr. Blum for "allergies, sinusitis, [and nasal] polyps for which [he] had to go every week and get four needles."

[*Id.* at 167, 721 *A*.2d 724.]

We here observe that as far as we can discern the "allergies" and "polyps" may not have been part of petitioner's compensable pulmonary condition. But Dr. Freedman, petitioner's treating physician as of March 1991 and whose opinion was accepted by the compensation judge, opined that the sinusitis was. In this respect, the doctor testified "when dust is inhaled it is absorbed, it deposits in the airway, certainly in the upper airway to bring about chronic inflammation ... the generalization of large volumes of mucous which is the major defense mechanism in the airway thus explaining chronic sinus and chronic sinusitis, chronic rhinitis...."

Petitioner's next employment at the Ford plant occurred in January 1991 when he was employed by respondent-appellant Raritan Valley Sheet Metal. Although his work at this time was outside and, thus, the exposure to irritants "better," he was still exposed to dust and fumes. We observed in our prior opinion that in addition to continuing treatment with Dr. Blum:

[W]hile employed by Raritan, petitioner had a second hospital visit at St. Peters on January 16, 1991 because of coughing and shortness of breath. The diagnosis impression was "broncospasm and shortness of breath." A January 16, 1991 chest x-ray revealed "poor inspiration, pleural thickening, bibasal infiltrates and cardiomegaly." On February 4, 1991, petitioner began treatment with another doctor, who at that time diagnosed "obstructive lung disease by history," among other conditions. On February 8, 1991, petitioner while still employed by Raritan, was again hospitalized and treated for "obstructive lung disease." Petitioner's employment with Raritan ended on February 15, 1991.

[*Id.* at 167–68, 721 *A.*2d 724.]

We related the additional evidence that:

Petitioner returned to work for one last time. His employer was Midway. He worked for March 4, 1991 to approximately March 11, 1991 on an office project removing old duct work and installing new duct work. Petitioner described the work as involving a lot of cutting through various duct work, pipe and insulation, exposing him to dust and dirt. After only one week working for Midway, petitioner stopped working altogether because of his breathing problems. On March 18, 1991, petitioner began treating with Dr. Andrew Freedman for his pulmonary condition, who opined that petitioner's condition first manifested itself in February 1990.

[*Id.* at 168, 721 *A.*2d 724.]

Importantly for the issue we address here, not only did Dr. Freedman offer the opinion that petitioner's disability became manifest in February 1990, but he also acknowledged during the trial that the medication he was then prescribing and which he had prescribed in 1991 was the same as proscribed for petitioner as of February 1990. *Id.* at 169, 721 *A.*2d 724. And too, as we related in *Levas I,*

Dr. Hermele also opined that petitioner's pulmonary condition became manifest in February 1990. [He "estimated"] petitioner's pulmonary disability was [then] 50% of total.

[*Ibid.*]

This "estimate" was explained by the doctor during the trial:

I believe that at that point in time that he didn't just develop asthma bronchitis or bronchitis, plueral asbestosis, a process that's been going on until an acute situation led him in the hospital with acute care. I believe if I had seen him back then, given the history that I had and the hospital records I had, I would probably estimate 50 percent disability.

The doctor was clear that, while he had not examined petitioner in 1990, he did have the medical records from that period and had relied upon them in responding to counsels' questions concerning the then measure of the disability. It was this evidence, seemingly accepted by the compensation judge as he had relied upon by Dr. Freedman and Dr. Hermele in his original decision, that led us to state:

We think it fairly evident here that both of petitioner's medical witnesses, whose opinions were essentially accepted by the compensation judge, considered petitioner's occupational pulmonary condition, though of long standing duration, to have become manifest, diagnosable and capable of measurement as of February 1990.

[*Id.* at 172, 721 *A.*2d 724.]

Despite this, the compensation judge imposed the full responsibility upon petitioner's last Ford plant employer, Midway Sheet Metal, on the basis of *Bond v. Rose Ribbon & Carbon Mfg. Co.*, 42 *N.J.* 308, 200 *A.*2d 322 (1964). This was because:

> Dr. Hermele measured the disability as of that time as 50% *partial* total. And that was the rub, in the judge's view. *We discern from both his oral decision and his November 17, 1997 supplemental written decision, that he believed that manifestation of a partial disability, progressive in nature, is not legally sufficient to preclude the application of Bond where the petitioner ultimately becomes totally disabled.*
>
> [*Id.* at 172, 721 *A.*2d 724 (emphasis added).]

But we pointed out that a partial permanent condition may be allocated to a prior employer where the condition is "fixed, arrested and definitely measurable" or "obvious, diagnosable and capable of measurement." 317 *N.J.Super.* at 172, 721 *A.*2d 724. *See Akef v. BASF Corp.*, 140 *N.J.* 408, 415, 658 *A.*2d 1252 (1995); *Gulick v. H.M. Enoch, Inc.*, 280 *N.J.Super.* 96, 111, 654 *A.*2d 987 (App.Div.1995). Given the medical record, we, then, concluded:

> Simply put, it is evident that petitioner's occupational condition manifested itself, both medically and functionally, prior to his Midway employment and, most probably, as early as the February 1990 hospitalization and commencement of pulmonary treatment thereafter. The compensation judge was simply wrong in ignoring this prior manifestation because the condition was not then total.
>
> [317 *N.J.Super.* at 173, 721 *A.*2d 724.]

We pause here to digress somewhat and revisit our discussion of what is sometimes referred to as the *Bond* rule in the context of an occupational disability and successive employers/carriers. It has generally been observed that:

> The successive [employer/]carrier problem arises when a worker suffers two or more episodes of disability with an intervening change of employers or change of insurance carriers by the same employer. The problem ... arises in occupational disease cases when the employer has changed insurers (or the employee has changed jobs) during the period in which the employee was exposed to the disease-causing substance.
>
> . . . .
>
> *The occupational disease cases present even more complexities than the injury cases.* First, there are often more insurers from whom to choose.... Second, the long time periods involved in the development of some occupational diseases make

it difficult, if not impossible, to determine which insurer was at risk at the time of the "injury."

> [9 *Larson's Workers' Compensation Law* § 153.01[1], at 153–2 to 153–3 (2000) (footnotes and citations omitted) (emphasis added).]

The possible ways of resolving these "complexities" are described in *Larson:*

> Three possible solutions to the successive carrier problem are: to hold the first insurer liable, to place liability on the insurer at risk at the time of the lasts injury, or to make them share in the liability. All three of these solutions are used in some instances and all three have certain drawbacks.
>
> The first solution, making the first insurer liable for any subsequent reinjury, presents the greatest drawbacks from the point of view of both that carrier and the claimant. The carrier, which may have been at risk when a relatively minor injury occurred, may now be liable for a major claim caused by circumstances beyond its control. The claimant is faced with two problems: in some states, he or she must contend with time limits on reopening the original claim, and his or her benefit level will usually be tied to that in effect at the time of his or her first injury—an injury which may have occurred 20 years previously. Thus, it is not surprising to find this solution is rarely used.[3]
>
> The third solution, apportionment, would be the ideal theory in a perfect world, i.e., a world in which all previous insurers were within the jurisdiction of the board, and the proportion of disability that occurred when each was at risk could be easily measured. Obviously, however, this is not a perfect world, and apportioning liability is complicated by such problems as out-of-state employers, statutes of limitations, and the difficulty of determining the proportion of liability attributable to each insurer. This latter problem is further complicated by the necessity of determining who—the insurers or the employee—is to bear the burden of establishing the basis for apportionment. Nonetheless, apportionment is a frequently used solution.[4]
>
> The second solution, assigning liability to the employer on risk at the time of the last injury, is easier to administer than the apportionment solution and, in most instances, will provide the highest level of benefits for the claimant. However, this rule may be unfair to the last carrier if the injury was not *caused* during the period it was on risk. Thus, this solution is usually modified so as to hold liable the last insurer whose time at risk coincides with the time of causation, *i.e.,* the carrier at the time of the "last injurious exposure."

> [*Id.* § 153.01[2], at 153–3 to 153–5 (footnotes and citations omitted).]

---

[3] *Peterson v. Hermann Forwarding Co.,* 267 *N.J.Super.* 493, 631 A.2d 1274 (App.Div.1993), *certif. denied,* 135 *N.J.* 304, 639 A.2d 303 (1994), might be considered as an example of this approach.

[4] We recently affirmed such an approach in our unreported opinion in *Baum v. Ricasoli & Santin,* No. A–6555–98T1 (App.Div. February 7, 2001).

The "last injurious exposure" solution is the predominant rule. *See* Russell G. Donaldson, Annotation, *Workers' Compensation: Liability of Successive Employers for Disease or Condition Allegedly Attributable to Successive Employments*, 34 *A.L.R.*4th § 3 (1984). As used in occupational disease cases, *Larson* observes:

> The last injurious exposure rule is particularly useful for allocating liability in occupational disease cases, which often involve a number of insurers. In an asbestosis case, for example, the initial task of discovering even the names of all of the insurers at risk during the claimant's working life may consume months of the Board's time before it could even begin to assess the proportion of exposure that occurred while each insurer was at risk. The delay in payment to claimants that would result in such a case prompted the Nebraska Supreme Court to adopt the last injurious rule in an asbestosis case in which the question of which insurer was liable was a question of first impression in the state. In deciding to adopt the rule, rather than attempt to apportion liability, as was urged by the last insurer at risk, the Court quoted from an earlier Tennessee case:
>
>> [W]e are constrained to so interpret our Workmen's Compensation Law as will best serve the interests of employees who suffer from an occupational disease, rather than attempt an adjustment of their rights in the light of equities that may exist between [successive employers].
>
> In an answer to the last insurer's argument that it was unfair for it to bear the entire liability for a disease that had developed while the employee had worked for over forty different employers, the Court noted that:
>
>> [E]ven though liability imposed under this rule can have a harsh result [in a particular case], there will be a spreading of the risk when the total picture of asbestos litigation is considered on a nationwide basis.
>
> [*Id.* § 153.02[5], 153–10 to 153–11 (footnotes and citations omitted).]

Both *Bond* and *Giagnacovo v. Beggs Bros.*, 64 *N.J.* 32, 311 *A.*2d 745 (1973), are cited by *Larson* as "last injurious exposure" cases.[5] *Larson, supra*, § 153.02[5], n. 26, 27. The Court in *Bond* recognized that this rule is "admittedly arbitrary" causing in some cases "apparently unfair results." 42 *N.J.* at 311, 200 *A.*2d 322. The Court's thought was, however, that "over the years it should result in an equitable balancing of liability," and would "avoid the morass into which litigation would be pitched were apportionment required" and would reflect the "most workable rule ... most

---

[5] The *dicta* in *Vastino v. MAN–Roland, Inc.*, 299 *N.J.Super.* 628, 633, 691 *A.*2d 873 (App.Div.), *certif. denied*, 151 *N.J.* 464, 700 *A.*2d 876 (1997), interpreting *Bond* as an apportionment case is incorrect.

consistent with the philosophy and public policy of the Workmen's Compensation Act." *Ibid.* But the rule is triggered only where an occupational exposure activates or causes a progressive disease, the existence of which is undisclosed and unknown until at or after the last of the potentially responsible employers. *Ibid.* Under these circumstances, "it is impossible upon ultimate revelation of its existence . . . to pinpoint in retrospect, the triggering date of such activation or inception." *Ibid. See also Baijnath v. Eagle Plywood & Door Mfrs., Inc.,* 261 *N.J.Super.* 309, 315, 618 *A.*2d 902 (App.Div.1993) ("Occupational injuries have an insidious etiology. They can exist for a protracted period without objective manifestation. An effort to apportion the result among the relevant historical employers and/or insurance carriers would be totally speculative.").

The facts in *Bond,* as we set them forth in our *Bond* decision (78 *N.J.Super.* at 504, 189 *A.*2d 459), affirmed by the Supreme Court, illustrate the point. The petitioner had worked for Rose Ribbon & Carbon Manufacturing Company from 1950 to April 1958. He was exposed to dust and fumes. In early 1956, he began to have pulmonary symptoms and in April 1958 was diagnosed with active tuberculosis, although a reading of an x-ray in 1956 had led one doctor to at that time diagnose "suspect tuberculosis." Until March 24, 1958, the employer's workers' compensation carrier was North America and thereafter New Jersey Manufacturers assumed the risk. The issue before the compensation judge was which carrier was responsible for the compensable disability. Finding the employer's work environment to have caused an activation of a pre-existing latent tuberculosis, the compensation judge concluded that the disability was "specifically demonstrable and cognizable on x-ray at the end of 1957." 78 *N.J.Super.* at 512, 189 *A.*2d 459. He imposed full responsibility upon the first carrier, North America. In reversing this determination, and imposing responsibility upon the last carrier, New Jersey Manufacturers, we rejected the judge's factual conclusion that the December 1957 x-ray showed demonstrable and cognizable disability. We said:

We find nothing in the proofs to sustain the compensation judge's conclusion that petitioner's disability—the lighting—up of his pre-existing latent tuberculosis—was "specifically demonstrable and cognizable" on the December 6, 1957 X-ray. The judge did not have the small film before him—it had been lost—and no one testified on the basis of an inspection of that film. He had only the report of Dr. Horowitz wherein, to repeat, after reading the film he noted, "Suspect tuberculosis—Questionable density," etc. Dr. Shapiro, claimant's personal physician, would say no more than that he would not, when petitioner saw him late in December 1957, make any diagnosis of tuberculosis without a positive sputum and a positive X-ray. He never testified to a specifically demonstrable and recognizable tuberculosis.

Nor do we find any support for the compensation judge's conclusion that petitioner's disability 'arose and came to its peak' during the period between July 9, 1950 and the end of 1957. No one testified that an active tuberculosis had reached a plateau or a peak in that period which, it may incidentally be noted, covered a long span of 7 ½ years. The "peak" of which the compensation judge spoke could, within the frame of reference of the language he used, have occurred even before North America came on the risk in 1955.

Turning to the County Court determination, we again find no support in the record for the judge's conclusion that petitioner met with "an accident in the nature of an occupational tuberculosis"—an awkward and rather meaningless phrase—and this between July 9, 1950 and the close of 1957, the same period fastened upon by the Division hearer. The county judge did not speak of any peak or plateau.

However suspect the condition shown on the small X-ray film taken by the League's mobile unit, the fact is that there is nothing in the record to show there was an active tuberculosis present. For all we know, what the film showed was the physical evidence left by the pre-existing, latent and temporarily arrested tubercular condition. Just when that condition flared into active being so as to "manifest the kind of tangible bodily injury or impairment which is specifically demonstrable, and cognizable even by a layman" (*Bucuk [v. Edward A. Zusi Brass Foundry]*, above, 49 *N.J.Super.*, [187] at page 206, 139 A.2d 436 [1958]), we do not know. We do not have a date when "a definite fault akin to a traumatic injury" (*Calabria [v. Liberty Mut. Ins. Co.]*, above, 4 *N.J.* [64] at page 71, 71 A.2d 550 [1950]) occurred. Certainly we do not have here the physical condition present in the *Brooks* case, "definitely measurable, fixed and arrested." None of the testimony, including that adduced by Manufacturers, the second insurer, establishes just when petitioner's active tuberculosis met the standards required in the cases just cited. All we know is that it was present on examination at the city clinic on April 17, 1958, but not that it was demonstrable, measurable or fixed, to the knowledge of the employer, employee, or anyone else before that date.

[78 *N.J.Super.* at 516–18, 189 A.2d 459.]

Both we and the Supreme Court, then, found the facts distinct, for instance, from *Brooks v. Bethlehem Steel Co.*, 66 *N.J.Super.* 135, 146, 168 A.2d 670 (App.Div.1961), *certif. denied*, 36 *N.J.* 29,

174 *A*.2d 657 (1961). As we described the facts in *Brooks* in our *Bond* decision:

> In *Brooks v. Bethlehem Steel Co.,* .. we dealt with a case of pulmonary emphysema found to be causally work-connected. Petitioner was first employed in 1946 and his symptomology began about Christmas 1948, continuing thereafter. He was not examined for his condition until August 1954, despite heavy wheezing, coughing and continuous bleeding from throat or nose. The diagnosis was emphysema. There were re-examinations in 1957 and 1958, but the medical testimony was that the condition remained static during the 1954–1958 period. *The proofs showed that at least by 1954 petitioner's condition had reached a plateau of arrested development and remained constant thereafter, and that he was entitled to permanent partial disability as of that date despite the fact that he continued working.*
>
> [78 *N.J.Super.* at 516, 189 *A*.2d 459 (emphasis added).]

*Compare also Gulick v. H.M. Enoch, Inc., supra,* 280 *N.J.Super.* at 106–07, 110–11, 654 *A*.2d 987. Unlike *Bond,* in *Brooks* petitioner's disability had plateaued, and had become arrested and measurable as a partial permanent disability during his prior employment.

As we have said, *Giagnacovo, supra,* 64 *N.J.* 32, 311 *A*.2d 745, too, has been referred to as a "last injurious exposure" case. It is not. *Giagnacovo* combines the *Brooks* situation of a compensable prior partial disability that has become fixed and measurable, and thus allocatable in that partial amount to the employer at the time it becomes so fixed and measurable, with the *Bond* situation where successive employments aggravate a condition but not to the point of being capable of measurement until after the last of the employments.

The petitioner in *Giagnacovo* was a bricklayer. During his employment with the first of his successive employers, he was treated for an aggravation to pre-existing arthritis in his right wrist. X-rays were taken and he was informed that the condition was such that he would at some point require surgery. Based upon this, the compensation judge assessed five percent permanent partial disability against the first employer. Thereafter petitioner worked for three other employers during which the wrist was "constantly aggravated, constantly bother[some]." *Id.* at 36, 311 *A*.2d 745. There was nothing, however, in the record of

further medical treatment, additional medical episodes, or other similar evidence that would be reflective of a measurable increase in the disability until the employment with the last employer when the condition worsened such that it required surgery. The compensation judge concluded that at that point the disability had increased to fifty percent partial permanent. Forty-five percent was, then, assessed against the last employer. In rejecting the last employer's contention that because the condition was manifested and, indeed, measured during the first employment, that employer should assume the subsequent increase in disability, the Supreme Court observed that the early x-ray and advice that surgery would be required at some future time was insufficient to allocate the subsequent forty-five percent increased disability to the first employer as it did not reflect a then fixed, arrested and measurable forty-five percent increase. *Id.* at 38–39, 311 *A.2d* 745. The compensation judge's allocation of five percent partial to the first employer and forty-five percent to the last was affirmed.

■ The *Bond* "last injurious exposure" rule, then, is not the only acceptable method in New Jersey for imposing responsibility for a compensable condition that may be aggravated by successive employers/carriers. Where the evidence warrants, apportionment among two or more of the causally contributing employers or carriers then on the risk may be appropriate. *See generally Larson, supra,* § 153.03. *See also* Donaldson, *supra,* § 5. It has been noted that in some states apportionment is unavailable unless there is evidence of the exact proportion of disability attributable to a particular employer. Other states hold that while such proof is preferable, absence thereof will merely result in a *pro rata* sharing of responsibility. Some states permit apportionment based upon the amount of time attributable to the petitioner's employment with the respective employers. *Larson, supra,* § 153.03[1] at 153–26 to 153–28.

■ Although our Supreme Court has not yet discoursed, generally, upon the various methods of apportionment among successive employers or carriers, where such apportionment is warrant-

ed, *Giagnacovo* indicates that the ordinary means of establishing a "revelation of a specific degree of physiological pathology" for an "internal" condition such as a pulmonary disability, is "medical examination and diagnosis." 64 *N.J.* at 38, 311 *A.2d* 745.

An example of such evidence is found in *Gulick v. H.M. Enoch, Inc., supra,* 280 *N.J.Super.* at 96, 654 *A.2d* 987. In our prior opinion we described *Gulick* thusly:

> In *Gulick, supra,* 280 *N.J.Super.* 96, 654 *A.2d* 987, for instance, we found that the claimant's condition, albeit not entirely total, was obvious and measurable prior to working for his last employer, which had been saddled by the compensation judge with liability for his disability. The claimant worked for Enoch, Inc. for three days in November of 1987 before stopping work due to his chronic pulmonary problems. The claimant had been exposed to dirt, dust and fumes during his work history from 1950 to 1987. The claimant's pulmonary condition first came to light during a visit with a pulmonary specialist on November 2, 1987, shortly before starting work for Enoch. That specialist, after reviewing x-rays and pulmonary function studies, concluded that the claimant had an advanced chronic obstructive pulmonary disease. We, therefore, found that the claimant's condition had been manifested and capable of measurement, albeit not total, prior to his last employment and that the last employer, Enoch, could not be held fully liable.
>
> [*Levas I,* 317 *N.J.Super.* at 172–73, 721 *A.2d* 724.] [6]

Here, on remand the compensation judge concluded that all of the Ford plant employments aggravated and exacerbated petitioner's pre-existing condition and contributed to his increasing disability to a material degree. But, he did not focus upon the voluminous medical records in this case to determine whether there were any incremental, measurable increases along the way, in what was at that point only a partial permanent condition. In particular, the judge did not analyze the medical evidence at the time of the D & M Sheet Metal employment or the expert opinions that found petitioner's condition at that point had become mani-

---

[6] The facts in our recent unreported decision in *Baum v. Ricasoli & Santin, supra,* No. A–6555–98T1, are further illustrative. There, the petitioner had filed compensation claims against eleven employers for whom he had worked through a union hall. Petitioner was a carpenter and, during his employments, sustained continuous aggravations to a pre-existing knee injury. We sustained an allocation of partial permanent disability against two of the eleven employers based upon medical reports which had measured increases during these two employments.

fest. It is at this point that petitioner began to have breathing problems which he had not had prior thereto. The manifestation was such that it required hospitalization and the commencement of treatment. While the compensation judge rejected Dr. Hermele's assessment that the disability at that point was fixed at fifty percent, he gave no reasons therefore except that he thought it speculative, despite Dr. Hermele's reliance upon the then medical records. Moreover, he did not reject the doctor's opinion that the condition was manifest, nor did he reject the opinion of Dr. Freedman. The judge also failed to consider the evidence of additional hospitalizations during the Raritan Valley Sheet and Metal employment. Rather, the judge said:

> For a long time after *Bond*, it was the policy of our courts to impose strict liability for occupational disease upon the last employer. Now our appellate courts are taking a second look at that policy. They are moving to the position that it is unfair to impose strict liability on the last employer in situations where acute symptoms of an occupational disease manifests themselves prior to the last employment, even though permanent (as opposed to temporary) disability within the meaning of *N.J.S.A.* 34:15–36 does not occur until after the last employment. This is what happened in Mr. Levas's case.

■ We pause here to comment on the phrase "even though permanent (as opposed to temporary) disability . . . does not occur until after the last employment. That is what happened in Mr. Levas's case." To begin with, there was no medical evidence that petitioner's pulmonary condition, latent until 1990, was only a temporary disability until the last of the Ford plant employers or thereafter. That was not petitioner's medical proofs, accepted by the compensation judge, and respondents' medical proofs were that petitioner's disability had no causative relationship to his employment exposure. More importantly, we have never said that "it is unfair to impose strict liability on the last employer in situations where acute symptoms of an occupational disease manifest themselves prior to the last employment, even though permanent (as opposed to temporary) disability . . . does not occur until after the last employment." It is, rather, a prior condition that is "fixed, arrested and measurable," that is to say one which can be ascertained in a measurable fashion as a partial permanent disabil-

ity, which may trigger an apportionment, as occurred in *Giagnacovo, supra,* 64 *N.J.* at 38–39, 311 *A.*2d 745. *See also Brooks v. Bethlehem Steel Co., supra,* 66 *N.J.Super.* at 146, 168 *A.*2d 670, and *Gulick v. H.M. Enoch, Inc., supra,* 280 *N.J.Super.* at 106–07, 110–11, 654 *A.*2d 987.

The judge himself recognized that, prior to the occurrence of the total disability, petitioner's disability was not one of a temporary nature when he commented, "I could find permanent partial disability against the first seven Respondents and permanent total disability against Midway, the last employer." He declined to do so, though, because "[i]n such a scenario, the Respondents who employed Mr. Levas prior to his last employer would pay a large permanent partial disability award. Then, the Second Injury Fund would be liable for the major portion of Levas' pre-existing disability. But that would be an injustice to the Fund." We do not understand the later comment as to the Fund and as to prior employers any partial permanent allocation would, of course, have to be reasonably related to the arrested nature of the disability at the time of any particular causative employment.

Finally, the judge was of the view that "[t]he clear thrust of [our] directive ... is that [he] apportion responsibility for payment of disability benefits among the various Respondents in a manner that is equitable." Notions of equity, however, were not part of what we instructed the judge to consider.

We therefore reverse the judge's order that each of the Ford plant respondents equally share in the award. Given the prior remand and time that has heretofore been spent on this case, we have determined we should exercise our original jurisdiction to some extent. Having independently reviewed the evidence, we are convinced a remand is required only as to D & M Sheet Metal, Raritan Valley Sheet Metal and Midway Sheet Metal. We do so because the record contains no medical evidence that would support a finding that petitioner's disability had reached a measurable, increased plateau during the other Ford plant employments. On the other hand, as to D & M Sheet Metal, we are convinced

petitioner's disability became fixed, arrested, and measurable during that employment. The judge should on remand measure the partial disability at that point, as he indicated he could in his decision. The medical records as to petitioner's condition and treatment during the Raritan Valley employment are not sufficiently undisputed such that we can, given our limited expertise, determine whether petitioner's disability had increased by that point to another fixed, arrested, and measurable plateau. The compensation judge shall make that determination and, if so, measure that amount of increase and apportion it to Raritan Valley. The remainder shall be allocated to Midway. We do not retain jurisdiction.

Reversed and remanded.